Aldridge v. Metro. Life Ins. Co., 2019 NCBC 81.

STATE OF NORTH CAROLINA

UNION COUNTY

JAMES ALDRIDGE,

          Plaintiff,

v.

METROPOLITAN LIFE
INSURANCE COMPANY; MSI
FINANCIAL SERVICES, INC. f/k/a
METLIFE SECURITIES, INC.; and
BENJAMIN LOWDER, JR.,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 1050 [MASTER FILE]
Related Cases:
18 CVS 1124 (Union); 18 CVS 12201
(Mecklenburg); 18 CVS 4978 (Guilford); 18
CVS 19512 (Mecklenburg); 18 CVS 528
(Lincoln); 18 CVS 307 (Yadkin)

**ORDER AND OPINION
ON DEFENDANTS'
RULE 12(b)(6) MOTIONS**

1.    **THIS MATTER** is before the Court on fourteen separate motions to dismiss for failure to state a claim pursuant to Rules 12(b)(6) and 9(b) of the North Carolina Rules of Civil Procedure ("Rule(s)") filed in the following seven actions: (i) *J. Aldridge v. Metropolitan Life Insurance Co., et al.*, (18 CVS 1050; Union County); (ii) *K. Aldridge v. Metropolitan Life Insurance Co., et al.*, (18 CVS 1124; Union County); (iii) *Goulet v. Metropolitan Life Insurance Co., et al.*, (18 CVS 12201; Mecklenburg County); (iv) *Kelly, et al. v. Metropolitan Life Insurance Co., et al.*, (18 CVS 4978; Guilford County); (v) *Olin v. Metropolitan Life Insurance Co., et al.*, (18 CVS 19512; Mecklenburg County); (vi) *Peterson v. Metropolitan Life Insurance Co., et al.*, (18 CVS 528; Lincoln County); and (vii) *Williams, et al. v. Metropolitan Life Insurance Co., et al.*, (18 CVS 307; Yadkin County) (the "Actions"). These Actions have been consolidated for the limited purpose of issuing this Opinion and one earlier Opinion

to decide the fourteen motions. The master file is designated as *J. Aldridge v. Metropolitan Life Insurance Co.*, (18 CVS 1050; Union County). (*See, e.g.*, ECF No. 75 (18 CVS 1050).)

2. Defendants' fourteen separate motions to dismiss also seek dismissal of certain claims for lack of standing pursuant to Rule 12(b)(1). Because of the complexity of the legal issues raised by the motions and the differing legal standards and analyses required under Rule 12(b)(1), on the one hand, and Rules 12(b)(6) and 9(b), on the other, the Court first considered Defendants' arguments pertaining to Rule 12(b)(1) and entered a separate order and opinion in each of the seven cases on August 15, 2019 ruling on the motions brought pursuant to that Rule, (*see, e.g.,* ECF No. 76 (18 CVS 1050)) (the "Rule 12(b)(1) Order and Opinion"). *See Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 53 (N.C. Super. Ct. Aug. 15, 2019). The Court herein only addresses those claims and allegations remaining in light of the Court's Rule 12(b)(1) Order and Opinion.

3. The pending motions before the Court in this Opinion can be divided into five (5) groups:

(a) Defendants Metropolitan Life Insurance Company ("MetLife Insurance") and MSI Financial Services, Inc., f/k/a MetLife Securities, Inc.'s ("MSI") (collectively, the "MetLife Defendants" or "MetLife") Motions to Dismiss: (i) Plaintiff James Aldridge's ("J. Aldridge") First Amended Complaint (the "J. Aldridge Complaint"), (ECF No. 52 (18 CVS 1050))[1]; (ii) Plaintiff

---

[1] For purposes of this paragraph, citations to docket entries on the Court's online docket are to the Motions to Dismiss in the Actions and not to the Complaints.

Katherine Aldridge's ("K. Aldridge") First Amended Complaint (the "K. Aldridge Complaint"), (ECF No. 51 (18 CVS 1124)); (iii) Plaintiff Adam Goulet's ("Goulet") First Amended Complaint (the "Goulet Complaint"), (ECF No. 37 (18 CVS 12201)); (iv) Plaintiffs John "Kris" Kelly ("Kelly"), Paul M. Leite ("Leite"), Randy J. Reittinger ("Reittinger"), Dana Lemons ("D. Lemons"), and Herbert Lee Lemons's ("H. Lemons") (collectively with D. Lemons, the "Lemonses") First Amended Complaint (the "Kelly Complaint"), (ECF No. 60 (18 CVS 4978)); (v) Donald B. Olin's ("Olin") Complaint (the "Olin Complaint"), (ECF No. 19 (18 CVS 19512)); (vi) Andrew Peterson's ("Peterson") First Amended Complaint (the "Peterson Complaint"), (ECF No. 46 (18 CVS 528)); and (vii) James Williams ("J. Williams") and William Van Williams's ("V. Williams") (collectively with J. Williams, the "Williamses") First Amended Complaint (the "Williams Complaint"), (ECF No. 48 (18 CVS 307)), (all twelve plaintiffs collectively, "Plaintiffs") (all seven complaints collectively, the "Complaints") (all seven of the MetLife Defendants' motions to dismiss the Complaints collectively, the "MetLife Motions");

(b)  Defendant Benjamin Lowder, Jr.'s ("Lowder") Motion to Dismiss the J. Aldridge Complaint, (ECF No. 50 (18 CVS 1050));

(c)  Lowder and Defendant Gary Wayne Hammond's ("Hammond") Motions to Dismiss: (i) the K. Aldridge Complaint, (ECF No. 52 (18 CVS 1124)); and (ii) the Olin Complaint, (ECF No. 17 (18 CVS 19512));

(d)     Hammond's Motions to Dismiss: (i) the Goulet Complaint, (ECF No. 39 (18 CVS 12201)); and (ii) the Peterson Complaint, (ECF No. 44 (18 CVS 528)); and

(e)     Defendant John D. Phillips's ("Phillips") Motions to Dismiss: (i) the Kelly Complaint, (ECF No. 58 (18 CVS 4978)); and (ii) the Williams Complaint, (ECF No. 46 (18 CVS 307)), (Lowder, Hammond, and Phillips collectively, the "Individual Defendants") (the Individual Defendants' motions to dismiss collectively, the "Individual Defendants' Motions").

4.     The Individual Defendants and the MetLife Defendants are collectively referred to herein as "Defendants." The MetLife Motions and the Individual Defendants' Motions as they relate to Rules 12(b)(6) and 9(b) are collectively referred to herein as the "Motions."

5.     Having considered the Motions, the parties' briefs in support of and in opposition to the Motions, the arguments of counsel at the March 6, 2019 hearing on the Motions, and the Complaints and the exhibits thereto, the Court hereby **GRANTS in part** and **DENIES in part** the Motions, for the reasons set forth below.

*Hemmings & Stevens, PLLC, by Aaron C. Hemmings and Kelly Ann Stevens, for Plaintiffs.*

*Parker Poe Adams & Bernstein LLP, by Charles E. Raynal IV, William Esser, Stephen Vincent Cary, and Katie M. Iams; and Morgan Lewis & Bockius, LLP, by Amy J. Greer, and John Alfred Vassallo, for the MetLife Defendants.*

*Cranfill Sumner & Hartzog LLP, by Marshal F. Wall and Mica Nguyen Worthy, for Defendants Lowder and Hammond.*

*Wyatt & Blake, by James Frank Wyatt III; and Mullins Duncan Harrell & Russell PLLC, by Leslie Cooper Harrell, for Defendant Phillips.*

Robinson, Judge.

## I.  INTRODUCTION

6.  These lawsuits arise out of an alleged Ponzi scheme[2] operated by businessman Richard C. Siskey[3] ("Siskey") for more than a decade.  Each plaintiff alleges that he or she engaged Siskey as a securities broker, investment advisor, and/or insurance agent.

7.  From 2000 until his death in December 2016, Siskey is alleged to have been a MetLife employee, working as a financial and investment advisor, securities broker, and insurance salesman at Wall Street Capitol, MetLife's Charlotte, North Carolina branch office through which MetLife and its agents sold securities and insurance policies and provided financial and investment advice.  The Individual Defendants are all MetLife employees who allegedly worked with Siskey at the Wall Street Capitol office.  Plaintiffs bring these Actions alleging that Defendants knew of,

---

[2] As explained by this Court in a related case, "[a] Ponzi scheme is a scam whereby early investors are paid returns from money contributed by later investors in order to entice more investors." *Stone St. Partners, LLC v. Williamson*, 2018 NCBC LEXIS 77, at *2 n.1 (N.C. Super. Ct. July 26, 2018) (quoting *Blyth v. McCrary*, 184 N.C. App. 654, 657 n.1, 646 S.E.2d 813, 815 n.1 (2007)); *see also United States v. Loayza*, 107 F.3d 257, 259 n.1 (4th Cir. 1997) (defining "Ponzi scheme" as a form of fraud "in which early investors are paid off with money received from later investors to prevent discovery and to encourage additional and larger investments").

[3] Neither Siskey nor his estate is a party to any of the Actions.

participated in, and/or assisted Siskey in concealing his Ponzi scheme and allowed Siskey to defraud Plaintiffs and others.[4]

## II.    PROCEDURAL BACKGROUND

8.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

9.    Plaintiffs initiated the Actions between April and October 2018,[5] and the Actions were thereafter designated as mandatory complex business cases under N.C.G.S. § 7A-45.4(a) on May 25, 2018 by order of then-Chief Justice Mark R. Martin, (*see, e.g.,* ECF No. 6 (18 CVS 1050)), and assigned to the Honorable Louis A. Bledsoe, III on May 29, 2018, (*see, e.g.,* ECF No. 2 (18 CVS 1050)).  Thereafter, the Actions were re-assigned to the undersigned on February 15, 2019.  (*See, e.g.,* ECF No. 66 (18 CVS 1050).)

---

[4] As of the date of this Order and Opinion, the undersigned presides over seven additional lawsuits involving Siskey's alleged Ponzi scheme.  *See, e.g., Brewer v. Metro. Life Ins. Co.,* 2018 CVS 21685 (Mecklenburg County, N.C. Super. Ct.); *Dreibelbis v. Metro. Life Ins. Co.,* 2019 CVS 5033 (Mecklenburg County, N.C. Super. Ct.); *Machen v. Metro. Life Ins. Co.,* 2018 CVS 24234 (Mecklenburg County, N.C. Super. Ct.); *Martin v. Metro. Life Ins. Co.,* 2018 CVS 22954 (Mecklenburg County, N.C. Super. Ct.); *Packer v. Metro. Life Ins. Co.,* 2019 CVS 12902 (Mecklenburg County, N.C. Super. Ct.); *Spillars v. Metro. Life Ins. Co.,* 2018 CVS 23038 (Mecklenburg County, N.C. Super. Ct.); *Strough v. Metro. Life Ins. Co.,* 2019 CVS 2298 (Union County, N.C. Super. Ct.).

[5] The original complaints in the first six Actions were filed on the following dates: (i) J. Aldridge Complaint – April 26, 2018, (ECF No. 3 (18 CVS 1050)); (ii) Peterson Complaint – April 27, 2018, (ECF No. 3 (18 CVS 528)); (iii) Kelly Complaint – May 3, 2018, (ECF No. 4 (18 CVS 4978)); (iv) K. Aldridge Complaint – May 7, 2018, (ECF No. 3 (18 CVS 1124)); (v) Williams Complaint – May 22, 2018, (ECF No. 3 (18 CVS 307)); and (vi) Goulet Complaint – June 18, 2018, (ECF No. 3 (18 CVS 12201).)  Each of these original complaints was amended as of right on September 26, 2018.  (ECF No. 37 (18 CVS 1050); ECF No. 31 (18 CVS 528); ECF No. 48 (18 CVS 4978); ECF No. 36 (18 CVS 1124); ECF No. 36 (18 CVS 307); ECF No. 24 (18 CVS 12201).)  The Olin Complaint was filed on October 9, 2018, (ECF No. 3 (18 CVS 19512)), and has not been amended.

10. The J. Aldridge Complaint, K. Aldridge Complaint, Goulet Complaint, Kelly Complaint, Peterson Complaint, and Williams Complaint each allege nine claims for relief: fraud; constructive fraud; violations of the North Carolina Securities Act ("NCSA"); negligent misrepresentation; professional negligence (Individual Defendants only); negligence (MetLife Defendants only); unfair and deceptive trade practices ("UDTP") (MetLife Defendants only); vicarious liability (MetLife Defendants only); and punitive damages. The Olin Complaint contains these same claims for relief along with additional claims for violations of the North Carolina Investment Advisors Act ("NCIAA") against (i) the MetLife Defendants, and (ii) Lowder and Hammond.

11. Defendants filed the Motions on December 3, 2018 with respect to all Complaints other than the Olin Complaint. Lowder and Hammond filed their motions as to the Olin Complaint on December 19, 2018, and the MetLife Defendants filed their motions with respect to the Olin Complaint on December 20, 2018. The Motions have been fully briefed, and the Court held a hearing on March 6, 2019, at which all parties were represented by counsel. The Motions are ripe for resolution.

## III. GENERAL FACTUAL BACKGROUND[6]

12. The Court does not make findings of fact when ruling on motions to dismiss under Rule 12(b)(6) but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motions.

### A. **The Parties**

13. Plaintiffs are all residents of North Carolina. They are, in some shape or fashion, all customers of MetLife, having been introduced to Wall Street Capitol, Siskey, and Individual Defendants at some point between 2000 and 2016. (J. Aldridge Compl. ¶¶ 112, 116; K. Aldridge Compl. ¶¶ 113–14; Goulet Compl. ¶¶ 112–13, 116; Kelly Compl. ¶¶ 117–18, 145–46, 170–71; Olin Compl. ¶¶ 112, 118, 120–21; Peterson Compl. ¶¶ 112–13; Williams Compl. ¶¶ 114, 117, 132–33.)

14. MetLife Insurance is a New York corporation. (J. Aldridge Compl. ¶ 3.) MSI is a Delaware corporation. (J. Aldridge Compl. ¶ 4.) During the time period relevant to the Complaints, MSI was a wholly owned subsidiary of MetLife Insurance.

---

[6] The Complaints, all prepared and drafted by the same attorneys at the same law firm, contain nearly verbatim allegations concerning the contours of the alleged Ponzi scheme and Defendants' alleged involvement therein before alleging, under a separate heading in each complaint, the allegations purportedly relevant to the particular plaintiff(s)' claims. Therefore, to assist in readability and to avoid unnecessarily large record citations, the Court cites to the numbered allegations in one complaint only—the J. Aldridge Complaint—for much of this section. Because neither Hammond nor Phillips are named defendants in the J. Aldridge Complaint, certain facts pertaining to these two defendants, and common to the Actions in which they are named as defendants, are drawn from the K. Aldridge Complaint (for Hammond) and the Kelly Complaint (for Phillips). The Court has carefully reviewed all the Actions to ensure that the allegations relevant to its analysis and rulings are consistent across each complaint, and where they are not, the Court has so noted. For reference, these general allegations appear in the J. Aldridge Complaint at paragraphs 9–111; the K. Aldridge Complaint at paragraphs 10–112; the Goulet Complaint at paragraphs 9–111; the Kelly Complaint at paragraphs 14–116; the Olin Complaint at paragraphs 10–111; the Peterson Complaint at paragraphs 9–111; and the Williams Complaint at paragraphs 11–113.

(J. Aldridge Compl. ¶ 4.) MSI is registered with the Securities and Exchange Commission (the "SEC") as a broker-dealer under section 15(b)(1) of the Securities Exchange Act of 1934 and is a registered investment advisor under N.C.G.S. § 78C-2. (J. Aldridge Compl. ¶ 4.) The MetLife Defendants have offices in Mecklenburg County, North Carolina and conduct business in North Carolina under the registered assumed name "Wall Street Capitol." (J. Aldridge Compl. ¶¶ 3–4, 9, 15.)

15. The Individual Defendants are all residents of North Carolina. (J. Aldridge Compl. ¶ 6; K. Aldridge Compl. ¶ 7; Kelly Compl. ¶ 10.) From 2000 through at least 2016, the Individual Defendants were MetLife employees, working alongside Siskey at MetLife's Wall Street Capitol office as licensed insurance agents, securities brokers, and financial and investment advisors. (J. Aldridge Compl. ¶¶ 24, 26; K. Aldridge Compl. ¶¶ 32, 34; Kelly Compl. ¶¶ 32, 34.) As part of their employment with MetLife, the Individual Defendants sold life, accident, and sickness insurance products, provided financial advice, and/or sold securities to Plaintiffs and other MetLife customers. (J. Aldridge Compl. ¶ 25; K. Aldridge Compl. ¶ 33; Kelly Compl. ¶ 33.) Additionally, in 2001, Phillips and Siskey formed WSC Holdings, LLC ("WSC Holdings"), for which Siskey and the Individual Defendants solicited MetLife customers' investments. (Kelly Compl. ¶ 35.) With MetLife's approval, Phillips and Siskey served as officers of WSC Holdings. (Kelly Compl. ¶ 35.)

**B.   Siskey and Wall Street Capitol**

16. In 1999, Siskey assisted MetLife in forming and establishing Wall Street Capitol as MetLife's branch office. (J. Aldridge Compl. ¶ 14.) In January 2000,

MetLife filed a Certificate of Assumed Named with the Register of Deeds in Mecklenburg County, North Carolina to operate its business under the name "Wall Street Capitol." (J. Aldridge Compl. ¶ 15.) MetLife leased office space for the Wall Street Capitol branch on the fourth floor of a building located at 4521 Sharon Road in Charlotte, North Carolina. (J. Aldridge Compl. ¶ 21.)

17. Under the name Wall Street Capitol, MetLife sold life insurance products to the public, and bought and sold securities, stocks, bonds, mutual funds, and other investment products as a broker-dealer. (J. Aldridge Compl. ¶¶ 16–17.) MetLife placed signs at the entrance and around the Wall Street Capitol office indicating that it was "an office of MetLife." (J. Aldridge Compl. ¶¶ 22, 37(a)).) Siskey also presented Wall Street Capitol to the public as "an office of MetLife[,]" (J. Aldridge Compl. ¶ 20), and stated in written advertisements and offers to sell securities that he was "the Founder of Wall Street Capitol, a broad based retail financial services company that is part of MetLife Financial Services[,]" (J. Aldridge Compl. ¶ 37(e)). MetLife made similar representations in advertisements. (*See* J. Aldridge Compl. ¶ 37(c).) MetLife also provided customers with periodic statements listing Wall Street Capitol as MetLife's branch office and its address as MetLife's address. (J. Aldridge Compl. ¶¶ 37(d), (f).) At all times relevant to the allegations in the Complaints, MetLife represented to Plaintiffs through its advertisements that Wall Street Capitol was a reputable and legitimate office of MetLife with trusted, reputable, and experienced financial advisers and life insurance agents. (J. Aldridge Compl. ¶¶ 38, 39.)

18. Siskey worked as a MetLife employee out of the Wall Street Capitol office from 2000 to 2016. (*See* J. Aldridge Compl. ¶¶ 14–15, 18.) Like the Individual Defendants, Siskey was an insurance salesperson, financial and investment advisor, securities salesperson, and broker for MetLife. (J. Aldridge Compl. ¶¶ 18, 36.)

### C. Wall Street Capitol Investment Ponzi Scheme

19. During his tenure at Wall Street Capitol, Siskey formed more than twenty different companies, including The Premier Fund, LLC ("Premier Fund"); Premier One, LLC ("Premier One"); Premier II, LLC ("Premier II"); Sharon Road Properties, LLC ("SRP"); TSI Holdings, LLC ("TSI Holdings"); SouthPark Partners, LLC ("SPP"); Siskey Industries, LLC ("Siskey Industries"); Siskey Capitol, LLC ("Siskey Capitol"); WSC Holdings; Siskey Capitol Opportunity Fund II, LLC ("Siskey Opportunity Fund II"); Stone Street Opportunity Fund II, LLC; and Carolina Preferred Investments II, LLC. (J. Aldridge Compl. ¶ 42.) MetLife was aware of Siskey's formation of, and appointment to officer positions in, these companies. (J. Aldridge Compl. ¶¶ 44–46.)

20. From the Wall Street Capitol office, Siskey and other MetLife employees (including the Individual Defendants) sold MetLife securities, as well as other securities and investments in Siskey's aforementioned companies, and used Siskey's companies to establish and implement an elaborate Ponzi scheme within MetLife's Wall Street Capitol branch office (the "Investment Ponzi Scheme"). (J. Aldridge Compl. ¶¶ 47–49.)

21. In October 2015, the Federal Bureau of Investigation ("FBI") began investigating Siskey. (J. Aldridge Compl. ¶ 50.) Just over a year later, the U.S.

government seized Siskey's assets and filed an affidavit in federal court stating that he had been using several different companies to perpetuate an elaborate Ponzi scheme. (J. Aldridge Compl. ¶¶ 50, 53, Ex. 8.) Specifically, the FBI identified the corporate bank accounts of WSC Holdings, SPP, Siskey Industries, SRP, and TSI Holdings as being used in the Ponzi scheme. (J. Aldridge Compl. ¶ 51.) Plaintiffs allege that filings with the North Carolina Secretary of State identify Siskey as the manager, president, and/or organizing member of TSI Holdings, WSC Holdings, SPP, and SRP (the "Bankrupt Entities") and Siskey Industries. (J. Aldridge Compl. ¶ 52.) In addition to the five companies identified by the FBI, Plaintiffs allege that other Siskey-related corporate entities involved in the Investment Ponzi Scheme include Premier Fund, Premier One, and Premier II (all eight entities together, referred to as the "Ponzi Entities"). (J. Aldridge Compl. ¶ 55.)

22. Plaintiffs allege that, under the guise and appearance of being an authorized agent of MetLife, Siskey purported to invest Plaintiffs' and other investors' money in the Ponzi Entities, but instead shuffled investor money between the bank accounts maintained by the Ponzi Entities and his personal bank accounts. (J. Aldridge Compl. ¶ 56.) The funds were used to pay for his lavish personal lifestyle, to pay his gambling debts, and to pay investors when they sought the return of their money. (J. Aldridge Compl. ¶ 56.) Siskey and the Individual Defendants, allegedly with MetLife's knowledge and while working at the Wall Street Capitol office, enticed Plaintiffs and other clients to invest cash, funds from their individual retirement accounts ("IRAs"), employee benefit plans, life insurance policies, and inheritances

with the Ponzi Entities by falsely promising them "guaranteed" safe asset-backed investments with a "fixed rate" of return that could be liquidated whenever the client desired. (J. Aldridge Compl. ¶¶ 57–60, 67.)

23. After the FBI seized Siskey's assets and publicly revealed the allegations concerning the Investment Ponzi Scheme, Siskey committed suicide on December 28, 2016. (J. Aldridge Compl. ¶¶ 53–54.)

24. Plaintiffs allege that the MetLife Defendants participated in and ratified the Investment Ponzi Scheme by allowing Siskey to continue as a MetLife employee and sell securities to investors, including Plaintiffs, when the MetLife Defendants had knowledge of Siskey's illegal conduct. (*See* J. Aldridge Compl. ¶¶ 69, 73.) Specifically, Plaintiffs allege that as early as 2002, MetLife's Vice President and Compliance Director and MetLife's Senior Compliance Consultant (together, "MetLife's Senior Directors") discussed with Siskey, on several dates by phone and in writing, Siskey's involvement with two of the Ponzi Entities: Premier Fund and Premier Fund II. (J. Aldridge Compl. ¶ 70.) Thereafter in 2004, Siskey was fined and suspended by the National Association of Securities Dealers ("NASD") for selling high-risk promissory notes issued by Premier Fund and Premier II without disclosing his participation in these outside securities transactions. (J. Aldridge Compl. ¶¶ 74–75.) Siskey's two-year suspension prohibited him from associating with any NASD member, including MetLife, in any capacity from 2004 to 2006. (J. Aldridge Compl. ¶¶ 76–77, Ex. 11 to J. Aldridge Compl.)

25. In March 2011, the United States Department of Labor ("DOL") determined that Siskey and Wall Street Capitol had violated the Employee Retirement Income Security Act of 1974 ("ERISA") by investing the assets of employee benefit plans into the same Ponzi Entities that MetLife's Senior Directors discussed with Siskey in 2002 and that were involved in the 2004 NASD investigation. (J. Aldridge Compl. ¶ 81.) As a result, the DOL permanently banned Siskey from acting in a fiduciary capacity on behalf of any employee benefit plan covered by ERISA. (J. Aldridge Compl. ¶ 81, Ex. 12 to J. Aldridge Compl.)

26. Plaintiffs allege that, despite its knowledge of Siskey's participation in fraudulent securities transactions in 2002 and again after the disciplinary actions taken by the NASD and DOL in 2004 and 2011 respectively, MetLife took no action to stop Siskey's fraud on Plaintiffs and on the public. (J. Aldridge Compl. ¶¶ 69, 72, 74, 76, 82.) Rather, during Siskey's 2004–06 suspension, MetLife allowed Siskey to continue providing investment advice and financial services, including selling securities from the Wall Street Capitol office to Plaintiffs and other MetLife customers. (J. Aldridge Compl. ¶¶ 77–78.)

27. Additionally, Plaintiffs allege that, in 2011 and again in 2013, MetLife "reinstated Siskey as a MetLife broker and entered into additional brokerage contracts with him." (J. Aldridge Compl. ¶ 84.) Plaintiffs allege that MetLife changed Siskey's employment status from employee to independent contractor to "wrongfully insulate itself from potential liability while it continued the exact same relationship with [Siskey]" that it had prior to this status change. (J. Aldridge Compl. ¶¶ 84–85.)

Plaintiffs allege that MetLife allowed Siskey to carry on his everyday business for MetLife as usual, continued to provide Siskey with office space, staff, furnishings, and equipment, and continued to pay him his same compensation because he was a top sales performer and generated significant profits for the MetLife Defendants. (J. Aldridge Compl. ¶¶ 79, 87.)

28. At no point from 2002 through 2016 did MetLife inform Plaintiffs, its other customers, or the public that Siskey was no longer a MetLife employee or agent after his suspensions and other disciplinary conduct. (J. Aldridge Compl. ¶ 87.) Plaintiffs allege that Siskey's status as an independent contractor was an "inaccurate characterization of [his] relationship [with MetLife,]" (J. Aldridge Compl. ¶ 88), because the MetLife Defendants still exercised the same supervision and control over Siskey, required him to follow company policies, and MetLife (not Siskey) had direct control over who was employed or terminated at the Wall Street Capitol office, (J. Aldridge Compl. ¶¶ 89−90).

29. Plaintiffs allege that the MetLife Defendants' actions and inactions denied Plaintiffs the opportunity to investigate or otherwise discover the truth of the Investment Ponzi Scheme. (J. Aldridge Compl. ¶ 68.)

30. Plaintiffs further allege that the Individual Defendants were aware of Siskey's disciplinary conduct but omitted this information when referring Plaintiffs and other MetLife customers to Siskey for the purpose of investing in the Ponzi Entities. (J. Aldridge Compl. ¶ 83.)

**D.** **Wall Street Capitol Insurance Ponzi Scheme**

31. In addition to the aforementioned alleged Investment Ponzi Scheme, Plaintiffs allege that Siskey misrepresented and misled MetLife customers to purchase various MetLife insurance policies, the commissions from which Siskey used to aid and contribute to the Investment Ponzi Scheme (the "Insurance Ponzi Scheme"[7]). (J. Aldridge Compl. ¶ 98.)

32. Siskey allegedly perpetuated the Insurance Ponzi Scheme by several illegal means. For some transactions, Siskey approached MetLife customers and investors with existing whole life insurance policies with other insurance companies and convinced them to surrender their policies and purchase new MetLife whole life policies, when in fact the MetLife replacement policies were term policies of much lesser value. (J. Aldridge Compl. ¶¶ 98–99.) As a result, Siskey would collect large sales commissions from the sale and issuance of new MetLife term policies. (J. Aldridge Compl. ¶ 99.) For customers of older age, Siskey would shepherd MetLife customers through the application and medical review process, filling in blank documents and submitting their life insurance applications with false information. (J. Aldridge Compl. ¶ 99.)

33. In other situations, in hopes of "cashing in" his customers' policies if a customer were to pass away, Siskey convinced MetLife customers to surrender their existing policies, apply for new MetLife policies with additional coverage, and

---

[7] The Investment Ponzi Scheme and the Insurance Ponzi Scheme are referred to together as the "Ponzi Schemes."

designate Siskey as the beneficiary for the additional amount. (J. Aldridge Compl. ¶¶ 98, 101.)

34. Siskey was able to use his insurance sales commissions, funds borrowed from the cash value of the insurance policies, and funds from his Investment Ponzi Scheme to pay the premiums on the MetLife life insurance policies, which effectuated his overall Ponzi scheme. (J. Aldridge Compl. ¶ 109.)

35. Plaintiffs allege that because MetLife's insurance applications require the applicant to list previous insurance policy information, "MetLife was placed on notice of the routinely questionable transactions" that Siskey was involved in. (J. Aldridge Compl. ¶ 103.) Plaintiffs also allege that MetLife received, approved, and underwrote the insurance policies that were used to perpetuate the Investment Ponzi Scheme. (J. Aldridge Compl. ¶¶ 103–04.) In fact, Plaintiffs allege that MetLife insurance policies could not be issued to Plaintiffs and other MetLife customers *without* the employees in MetLife's underwriting department reviewing the applications, reviewing all related documents, and approving them. (J. Aldridge Compl. ¶ 107.) Specifically for customers that replaced their whole life policies with term policies, MetLife approved and underwrote the replacement policies with clear knowledge that the MetLife policy was of lesser value. (J. Aldridge Compl. ¶ 104.)

36. Nonetheless, MetLife "ignored" the suspect life insurance applications and "failed to stop employee Rick Siskey because those activities were generating substantial profits" for MetLife. (J. Aldridge Compl. ¶ 108.) Instead, MetLife approved and paid Siskey commissions "over and over again[.]" (J. Aldridge Compl.

¶ 105.) Plaintiffs allege that MetLife profited from the Insurance Ponzi Scheme in the form of "enormous life insurance premiums collected from Rick Siskey[.]" (J. Aldridge Compl. ¶ 110.)

### E. Bankruptcy Proceedings and the Rule 12(b)(1) Order and Opinion

37. Within a month of Siskey's death, on January 27, 2017, an involuntary bankruptcy petition was filed against one of the Ponzi Entities, TSI Holdings, thereby initiating a Chapter 7 bankruptcy case.[8] (J. Aldridge Compl. ¶ 62.) Thereafter, WSC Holdings, SPP, and SRP also entered bankruptcy, with the Bankruptcy Trustee serving as trustee for each of the Bankrupt Entities.[9] (J. Aldridge Compl. ¶ 63; Ex. 10 to J. Aldridge Compl.)

38. Plaintiffs each filed proofs of claim in the Bankruptcy Proceedings directed to the particular Bankrupt Entity in which they invested. *Aldridge*, 2019 NCBC LEXIS 53, at *20. Specifically, Goulet, Kelly, and Olin filed proofs of claim regarding TSI Holdings; J. Aldridge, K. Aldridge, Leite, the Lemonses, and Reittinger filed proofs of claim regarding WSC Holdings; J. Aldridge filed a proof of claim regarding SPP; and J. Aldridge, Kelly, Peterson, and the Williamses filed proofs of claim regarding SRP. *Id.*

39. In late 2018, the Bankruptcy Trustee and other parties to the Bankruptcy Proceedings, including the MetLife Defendants, negotiated and submitted for the Bankruptcy Court's approval a settlement and release agreement (the "Settlement

---

[8] *In re TSI Holdings, LLC*, Petition No. 17-30132 (Bankr. W.D.N.C.).
[9] *In re WSC Holdings, LLC*, Petition No. 17-30338 (Bankr. W.D.N.C.); *In re SouthPark Partners, LLC*, Petition No. 17-30339 (Bankr. W.D.N.C.); *In re Sharon Road Properties, LLC*, Petition No. 17-30363 (Bankr. W.D.N.C.).

Agreement"). *Id.* at 21. The Settlement Agreement essentially provides, in relevant part, that the Bankruptcy Trustee, on behalf of the Bankrupt Entities, releases all claims against MetLife arising out of the Ponzi Scheme in exchange for MetLife's contribution to a bankruptcy settlement fund. *Id.* At the hearing on the Motions, counsel for all parties to the Settlement Agreement represented and confirmed to the Court that all conditions precedent to the Bankruptcy Court's approval of the Settlement Agreement had been satisfied and that the Bankruptcy Court approved the settlement, which is now in effect. *Id.* at 23.

40. Defendants moved to dismiss Plaintiffs' claims regarding their investments in the Bankrupt Entities pursuant to Rule 12(b)(1), arguing that: (a) the Bankruptcy Trustee has "first crack" at these claims; (b) the Bankruptcy Trustee has negotiated a settlement of these claims on behalf of the Bankrupt Entities; and (c) the Settlement Agreement includes a release of the MetLife Defendants and the Individual Defendants, as employees and agents of the MetLife Defendants, from all claims brought by Plaintiffs arising from Plaintiffs' investments in the Bankrupt Entities. *Id.* This Court decided these motions pursuant to Rule 12(b)(1). That decision rested largely on the nature on scope of the "first crack" doctrine, which—at its essence— reflects the principle that "[o]nly the trustee of the bankruptcy estate has standing to pursue claims that belong to the bankruptcy estate unless and until the trustee abandons those claims." *Id.* at 29 (citing *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999)). For the reasons fully articulated in the Rule 12(b)(1) Order and Opinion, this Court denied the Individual Defendants' motions

seeking dismissal of Plaintiffs' claims under the "first crack" doctrine in their entirety. As to the MetLife Defendants, this Court granted the motions seeking dismissal of Plaintiffs' fraud, constructive fraud, and negligent misrepresentation claims brought *directly* against the MetLife Defendants to the extent claims arise from Plaintiffs' investments in the Bankrupt Entities. *Id.* at *73–74. These claims, however, go forward to the extent Plaintiffs seek to hold MetLife vicariously liable for the actions of Siskey or the Individual Defendants. *Id.* The Court also granted the motions seeking dismissal of Plaintiffs' negligent supervision claims to the extent the claims are premised on Plaintiffs' investments in the Bankrupt Entities. *Id.* at *75. Accordingly, and because a grant of a Rule 12(b)(1) motion is a determination that the Court does not have subject matter jurisdiction over the dismissal of claims, the Court's Rule 12(b)(6) analysis shall be limited accordingly.

## IV. PLAINTIFF-SPECIFIC FACTS

41. The preceding Section III of this Opinion sets forth the general factual background commonly addressed in each of the Complaints. In addition to that foregoing factual background, each Complaint sets forth plaintiff-specific facts, detailing the named plaintiff(s) involvement with Wall Street Capitol, Siskey, the Individual Defendants, and MetLife. The following subsections set forth those plaintiff-specific facts relevant to the Court's consideration of the Motions that vary from complaint to complaint.

**A.    J. Aldridge Complaint Allegations**

42.    J. Aldridge, a small business owner, was introduced to Siskey by his accountant around 2000.  (J. Aldridge Compl. ¶ 112.)  At that time, Siskey invited J. Aldridge to the Wall Street Capitol office, where he met Lowder.

43.    Over the next fifteen years, J. Aldridge received investment and insurance advice from Lowder and Siskey at the Wall Street Capitol office.  (J. Aldridge Compl. ¶ 123.)  When J. Aldridge was unable to visit the office, Lowder would go to J. Aldridge's business.  (J. Aldridge Compl. ¶ 141.)  Under the guise and authority of MetLife, Siskey and Lowder convinced J. Aldridge to invest over $900,000 into the Investment Ponzi Scheme.  (J. Aldridge Compl. ¶¶ 123, 140.)  Siskey represented that this money would be placed in investments with reputable companies.  (J. Aldridge Compl. ¶ 124.)  Instead, Siskey placed it into the Ponzi Entities, funneled investments into other companies, and diverted the funds into Siskey's personal account.  (J. Aldridge Compl. ¶¶ 124, 126.)  J. Aldridge alleges that Lowder worked closely with Siskey and participated in the fraudulent transactions.  (J. Aldridge Compl. ¶ 125.)  He further alleges that Lowder and Siskey told him that their sales of securities to him were registered with legitimate companies and that his investments were "guaranteed and safe investments."  (J. Aldridge Compl. ¶ 126.)

44.    In total, based on these representations, J. Aldridge invested $259,000 into Premier II in 2001, which was later transferred to WSC Holdings in 2003; $200,000 into Pinnacle at Mountain View, LLC in 2003−2004; $100,000 into Richmond Hills in 2006; $50,000 into SPP in 2009; $50,000 into SDMI in 2011, $50,000 into Contrafect

in 2011; $95,000 into OST; $40,000 into Level Brands/Level Beauty Group ("LBI") in 2015; and $25,000 into Kure Corp. ("Kure") in 2015. (J. Aldridge Compl. ¶ 128.)

45. J. Aldridge also alleges that Siskey told him in 2001 that he would make a ten percent return on any transfers of funds or investments into WSC Holdings and that there was "no risk." (J. Aldridge Compl. ¶ 132.) Regarding the OST investment, Siskey "made false statements in the presence of . . . Lowder and affirmed by [Lowder] that there was a five percent (5%) rate of return with 'no risk.'" (J. Aldridge Compl. ¶ 133.) Regarding his SPP investment, Siskey and Lowder made false statements to J. Aldridge on or around September 11, 2014 that there was a 4% fixed guaranteed rate of return on this investment. (J. Aldridge Compl. ¶¶ 134–35.) Further, J. Aldridge alleges that "[f]rom the early 2000s through November 2016, [he] received false investment statements from MetLife's Wall Street Capitol office assuring his investments were safe and documenting funds that did not exist." (J. Aldridge Compl. ¶ 160.) J. Aldridge also received income statements from the Wall Street Capitol office, upon which he based his tax returns for nearly fifteen years. (J. Aldridge Compl. ¶ 161.) He believed that these statements were from MetLife. (J. Aldridge Compl. ¶ 160.)

46. As a result of Siskey, Lowder, and the MetLife Defendants' actions and inactions, J. Aldridge alleges that he has lost "most" of the money he invested through Siskey and Lowder. (*See* J. Aldridge Compl. ¶ 166.) Even those investments that were not funneled into Siskey's personal accounts and the Ponzi Entities have been "diluted by the fallout of the discovery of the massive Wall Street Capitol Ponzi

[s]cheme due to their association with Siskey." (J. Aldridge Compl. ¶ 168.) This includes J. Aldridge's investments in LBI and Kure. (J. Aldridge Compl. ¶ 169.)

47. J. Aldridge was also a MetLife insurance customer. (J. Aldridge Compl. ¶ 143.) In 2004, J. Aldridge and his family held three whole life insurance policies with Guardian Life Insurance Company ("Guardian"), which Siskey convinced J. Aldridge to surrender and replace with two $1,000,000 MetLife policies. (J. Aldridge Compl. ¶¶ 144–45.) Lowder assisted Siskey with the transaction and handled the paperwork. (J. Aldridge Compl. ¶ 148.) When providing quotes for at least one of the new MetLife policies, Siskey and Lowder told J. Aldridge that the policy was a whole life policy when in fact it was a term policy of much lesser value. (J. Aldridge Compl. ¶ 146.) Siskey also told J. Aldridge that he would not have to pay premiums on the new policy and concealed the fact that Siskey had listed himself as a beneficiary/owner of the policy. (J. Aldridge Compl. ¶ 146.) Lowder was aware and concealed from Mr. Aldridge that the new policy was a term policy and that Siskey listed himself as a beneficiary. (J. Aldridge Compl. ¶ 148.) J. Aldridge, following Siskey's advice, approved the transfer of his policies from Guardian to MetLife, and as a result, lost the entire cash value of his whole life policies with Guardian. (J. Aldridge Compl. ¶ 147.)

48. In 2011, J. Aldridge was advised to sell the $1,000,000 policy with MetLife to a third-party for the purpose of paying the premiums for a replacement $2,000,000 policy with MetLife. (J. Aldridge ¶ 152.) Siskey told J. Aldridge that he would no longer have to pay any premiums, that his beneficiaries would be entitled to

$1,000,000 upon his death, and that the other $1,000,000 in death benefits would go to the third-party who purchased the original MetLife policy. (J. Aldridge Compl. ¶ 152.) In fact, Siskey was using monies from the Investment Ponzi Scheme to pay J. Aldridge's premiums, and Siskey named himself as beneficiary of the additional $1,000,000 in life insurance proceeds. (J. Aldridge Compl. ¶¶ 152–53.) J. Aldridge alleges that MetLife reviewed, approved, and underwrote this 2011 MetLife policy. (J. Aldridge Compl. ¶ 154.) MetLife "received and profited from the premiums paid for this new policy[.]" (J. Aldridge Compl. ¶ 155.)

49. After Siskey's death, J. Aldridge discovered that he was one of the individuals upon which Siskey "was holding tens of millions of dollars of life insurance policies on their lives, all while using the proceeds from [the Investment Ponzi Scheme] to pay premiums of over 1.2 million dollars . . . per year to MetLife." (J. Aldridge Compl. ¶ 156.) Because J. Aldridge's insurance policies were not paid in full as represented to him by Siskey and Lowder, he now has to pay over $83,000 in annual premiums for his MetLife insurance policies. (J. Aldridge Compl. ¶ 157.)

50. With respect to both his investment transactions and purchase of life insurance, J. Aldridge alleges that had he known of Siskey's fines, suspensions, and other illegal activities, he would not have invested in the Ponzi Entities or surrendered his Guardian insurance policies in favor of new MetLife policies. (J. Aldridge Compl. ¶¶ 139, 159.) J. Aldridge further alleges that because of the false investment statements from Wall Street Capitol, he could not have discovered the

Investment or Insurance Ponzi Schemes on his own prior to December 2016. (J. Aldridge Compl. ¶ 163.)

## B.   K. Aldridge Complaint Allegations

51.   K. Aldridge is J. Aldridge's wife. (K. Aldridge Compl. ¶ 113.) She alleges that she was introduced to Wall Street Capitol, Siskey, Hammond, and Lowder in 2006. (K. Aldridge Compl. ¶¶ 113–14.) From the Wall Street Capitol office, K. Aldridge received and acted pursuant to investment advice from Siskey, Lowder, and Hammond, which first included rolling over her IRA into a MetLife account on June 1, 2006. (K. Aldridge Compl. ¶¶ 118, 125–26.)

52.   Then, on April 12, 2016, she was induced by Siskey, Lowder, and Hammond to invest $100,000 in WSC Holdings. (K. Aldridge Compl. ¶ 140.) In 2016, Siskey, Lowder, and Hammond falsely represented to her that the WSC Holdings investment was a "guaranteed and safe investment with guaranteed rates of return when there was no guaranteed rates of return[.]" (K. Aldridge Compl. ¶ 141.) Siskey, Lowder, and Hammond told her that the WSC Holdings investment was a "legitimate investment[,]" rather than telling her that the money was being taken and deposited into other accounts or used by Siskey for his own personal use. (K. Aldridge Compl. ¶¶ 141, 148.) To cover for their misstatements, on November 28, 2016, Siskey, Lowder, and Hammond sent K. Aldridge, from their Wall Street Capitol office, an inaccurate statement indicating her investment was worth $103,138.89. (K. Aldridge Compl. ¶ 142.) In subsequent months, Siskey, Lowder and Hammond continued to represent that her investment in WSC Holdings was safe and earning interest. (K.

Aldridge Compl. ¶ 149.)  From the summer of 2016 through December of 2016, K. Aldridge continued to receive investment statements representing the same and believed that these statements were from MetLife through Wall Street Capitol.  (K. Aldridge Compl. ¶ 154.)

53.     She alleges that because of these misrepresentations, as well as the false reporting on her investment statements from MetLife, she was kept "in the dark[,]" and continued to trust and believe Siskey, Lowder, and Hammond.  (K. Aldridge Compl. ¶ 158.)  Because of this misplaced trust and the MetLife Defendants' failure to inform her about Siskey's disciplinary history, K. Aldridge was prevented from discovering the Investment Ponzi Scheme.  (K. Aldridge Compl. ¶¶ 156, 158.) Accordingly, she lost the majority of her $100,000 invested in WSC Holdings.  (K. Aldridge Compl. ¶ 145.)

54.     K. Aldridge is also the intended beneficiary on her husband's MetLife life insurance policies.  (K. Aldridge Compl. ¶¶ 118, 128.)  On June 17, 2011, she was present when J. Aldridge executed a form, at the direction of Siskey and Lowder, that indicated she would "receive $500,000.00 as the spouse of the insured and would be a beneficiary of the new policy sold by MetLife and the other $500,000.00 would go to [their] children . . . upon [J. Aldridge's] death."  (K. Aldridge Compl. ¶ 130.)  This form was signed by both Siskey and Lowder.  (K. Aldridge Compl. ¶ 130.)  K. Aldridge alleges that she was harmed by her husband's cancellation of his previous insurance policies in favor of the new MetLife policies, which were of much lesser value than they were represented to be.  (K. Aldridge Compl. ¶¶ 134–37.)

## C.    Goulet Complaint Allegations

55.    In 2013, Hammond introduced Goulet to Siskey and Wall Street Capitol. (Goulet Compl. ¶ 112.)    Although Hammond allegedly knew about Siskey's disciplinary history, he did not tell Goulet this information when advising Goulet to meet with Siskey.  (Goulet Compl. ¶¶ 119, 122.)  In late March 2015, Goulet met with Siskey at the Wall Street Capitol office, and Siskey represented to him that Goulet could invest with Wall Street Capitol and receive a "guaranteed" rate of return with "no risk."  (Goulet Compl. ¶ 118.)  On April 8, 2015, after meeting with Siskey and Hammond, Goulet was induced into investing $420,000 in TSI Holdings, and was misinformed by Siskey that he was "guaranteed" a 3.9% rate of return on his investment so long as he kept the funds invested for one year.  (Goulet Compl. ¶ 120.) Siskey also misrepresented to him that the funds would be available to him at any time.  (Goulet Compl. ¶ 120.)  Under the guise of MetLife, Siskey "made numerous misrepresentations and omitted material facts regarding the suitability of TSI Holdings" and concealed that he was using "funds deposited to the company's bank account for his own personal benefit."  (Goulet Compl. ¶ 121.)  Goulet later sought a return of his investment and received a portion in late 2016.  (Goulet Compl. ¶ 123.) The portion he did not receive back is now subject to *pro rata* distributions in Bankruptcy Court.  (Goulet Compl. ¶¶ 123–24.)

56.    On October 10, 2016, upon the advice of Hammond, Goulet consulted with Siskey and was induced into investing $53,000 in LBI.  (Goulet Compl. ¶ 126.) Hammond again omitted "known material facts" when advising Goulet to meet with

Siskey regarding this investment.  (Goulet Compl. ¶ 126.)  Now managed by Stone Street Partners, this investment is "degraded" and "worth significantly less" due to "the taint of Siskey's fraud."  (Goulet Compl. ¶ 126.)

57.  Goulet alleges that Hammond and the MetLife Defendants were aware of the disciplinary actions taken against Siskey in 2004 and 2011 and failed to convey this information to Goulet at any point prior to and after he invested with Wall Street Capitol.  (Goulet Compl. ¶¶ 119, 129.)  He also alleges that the MetLife Defendants did not tell him about their investigation into Siskey's actions in 2014 or 2015, which revealed many facts of the Investment Ponzi Scheme, and instead concealed that investigation from Goulet.  (Goulet Compl. ¶ 129.)  Goulet alleges that if he had known about Siskey's disciplinary history, he would not have invested in TSI Holdings.  (Goulet Compl. ¶ 125.)

### D.  Kelly Complaint Allegations

58.  Kelly, Leite, Reittinger, and the Lemonses (collectively, the "Kelly Plaintiffs") jointly filed their lawsuit.  They allege that they were introduced to Wall Street Capitol through Phillips.  (Kelly Compl. ¶¶ 117, 145, 170, 196, 222.)

59.  The Kelly Plaintiffs are all small business owners who primarily met with Phillips at their respective places of business, and not the Wall Street Capitol office.  (Kelly Compl. ¶¶ 118, 146, 171, 197, 223.)  Notwithstanding their meeting place, Phillips represented to them that he was an employee and agent of Wall Street Capitol.  (Kelly Compl. ¶¶ 118, 146, 171, 197, 223.)

60.     Each of the Kelly Plaintiffs invested in different companies with Wall Street Capitol based on representations from Siskey and/or Phillips that their investments were "guaranteed." (Kelly Compl. ¶¶ 119, 147, 173, 199, 227.) Specifically, in 2015 and 2016, Kelly invested $885,227 with Wall Street Capitol, which included three investments in TSI Holdings, totaling $305,227, on June 23, July 28, and November 20, 2015, (Kelly Compl. ¶ 121); a $100,000 investment in SRP, (Kelly Compl. ¶ 129); $330,000 in Siskey Capitol, LLC, (Kelly Compl. ¶ 131); $75,000 in LBI, (Kelly Compl. ¶ 131); and $75,000 in Kure, (Kelly Compl. ¶ 131). Leite invested $100,000 in WSC Holdings on August 15, 2015;[10] and $50,000 in Kure. (Kelly Compl. ¶ 156; Ex. 21.) (Kelly Compl. ¶¶ 149, 150; Ex. 19.) Reittinger invested $100,000 in WSC Holdings on August 12, 2016, (Kelly Compl. ¶ 175; Ex. 22.), and $50,000 in securities in Kure, (Kelly Compl. ¶ 182). The Lemonses invested $100,000 each in WSC Holdings on April 5, 2016 by transferring funds from their IRAs. (Kelly Compl. ¶¶ 202–04, 230; Exs. 25 & 26.)

61.     The Kelly Plaintiffs allege that Phillips and the MetLife Defendants knew about the disciplinary actions taken against Siskey in 2004 and 2011 and failed to convey this information to them at any point prior to or after they invested with Wall Street Capitol. (*See* Kelly Compl. ¶¶ 122, 134, 162, 188, 212, 237.) They also allege that the MetLife Defendants did not tell the Kelly Plaintiffs about their investigation into Siskey's actions in 2014 or 2015, which revealed many facts of the Investment

---

[10] This date is inconsistent in the Kelly Complaint; in paragraph 149, Leite alleges that he invested in WSC Holdings on August 15, 2015, but twice in Exhibit 19, Leite's investment statement indicates that his investment was in 2016. (*See* Kelly Compl. Ex. 19.)

Ponzi Scheme, and instead concealed that investigation from the Kelly Plaintiffs. (Kelly Compl. ¶¶ 137, 163, 189, 215, 240.)

62. Further, from the time of the Kelly Plaintiffs' investments through December of 2016, Siskey and Phillips, from the Wall Street Capitol office, sent fraudulent statements to the Kelly Plaintiffs indicating that their investments were safe and worth more than these plaintiffs' original investments. (Kelly Compl. ¶¶ 138, 152, 185, 211, 236.) The Kelly Plaintiffs (with the exception of H. Lemons) attached as exhibits to the Kelly Complaint examples of the allegedly inaccurate statements. (Exs. 18, 19, 22, 26 to Kelly Compl.) Kelly received a statement on September 20, 2016 indicating that his investment in TSI Holdings was worth $322,308.24. (Kelly Compl. ¶ 125; Ex. 18.) Leite received a statement on September 30, 2016 indicating that his investment in WSC Holdings was worth $100,625. (Kelly Compl. ¶¶ 152, 159; Ex. 19.) Reittinger received a statement on September 30, 2016 indicating that his investment in WSC Holdings was worth $100,694.44. (Kelly Compl. ¶ 178; Ex. 22.) In the case of D. Lemons, she alleges that her investment was falsely reported by Phillips and Siskey to her account custodian, Mainstar Trust, which in turn resulted in an inaccurate statement from Mainstar Trust in December 2016 indicating that her balance was $103,215.93. (Kelly Compl. ¶ 207; Ex. 26.)

63. The Kelly Plaintiffs allege that because of Siskey and Phillips's misrepresentations and omissions, and MetLife's concealment of their investigation into Siskey, the Kelly Plaintiffs were prevented from and could not have discovered the Investment Ponzi Scheme until December 2016. (Kelly Compl. ¶¶ 140, 165, 191,

217, 242.) They further allege that, had they known of Siskey's violations of law and resulting disciplinary actions in 2004 and 2011, they would not have invested with Wall Street Capitol. (*See, e.g.,* Kelly Compl. ¶ 256.)

### E. Olin Complaint Allegations

64. Prior to becoming a Wall Street Capitol client and customer, Olin knew Siskey through his relationship with Consolidated Capital Group, Inc., having invested $895,462.28 from an IRA on August 11, 1998. (Olin Compl. ¶ 120.) After MetLife's Wall Street Capitol office was established in late 1999/early 2000, Siskey introduced Olin to Wall Street Capitol and represented to him that investments with Wall Street Capitol were "guaranteed" with a "fixed rate" of return. (Olin Compl. ¶¶ 112, 121.) Siskey also told Olin that investing with Wall Street Capitol was "better than going to a bank." (Olin Compl. ¶ 121.) Based on these representations, Olin decided to move his business to Wall Street Capitol. (Olin Compl. ¶ 121.) At Wall Street Capitol, Olin met and worked with Lowder and Hammond. (Olin Compl. ¶ 116.) Through his relationship with Siskey, Lowder, and Hammond, Olin became both an investment and insurance customer of MetLife. (Olin Compl. ¶¶ 117–19.)

65. Siskey continued to represent that investments with Wall Street Capitol were "guaranteed" with a "fixed rate" of return after Olin moved his investments to Wall Street Capitol. (Olin Compl. ¶ 122.) Olin alleges that Lowder and Hammond made similar representations when meeting with Olin at the Wall Street Capitol office. (Olin Compl. ¶¶ 122, 150.) In 2000, Siskey advised Olin to invest $400,000 of his investments in the Premier Fund and specifically represented that this

investment was "guaranteed" by Wall Street Capitol and would earn a "guaranteed fixed rate" of return. (Olin Compl. ¶ 123.) From 2000 through 2016, "Siskey and other MetLife employees" prepared and delivered false periodic written statements to Olin indicating that his investment in the Premier Fund was safe and maturing in value. (Olin Compl. ¶ 127.) Olin alleges that these statements were prepared and delivered with full knowledge of and under the supervision of MetLife. (Olin Compl. ¶ 127.)

66. Olin alleges that Siskey was able to conceal his Investment Ponzi Scheme by distributing portions of invested funds to investors when requested. (Olin Compl. ¶ 129.) From 2000 through 2016, Olin made such requests and received portions of his investments as distributions when needed. (Olin Compl. ¶ 130.)

67. On August 8, 2010, Olin received $773,299.24 from an asset sale related to a previous investment in Carolina Beer & Beverage, LLC ("Carolina Beer"), which was an investment made through Wall Street Capitol. (Olin Compl. ¶ 131.) "Using a classic Ponzi scheme tactic," in October 2010, Siskey advised Olin to invest those sale proceeds in TSI Holdings, promising Olin that he would earn a "guaranteed 5% rate of return." (Olin Compl. ¶ 132.) These statements were made in the MetLife offices in the presence of Lowder and Hammond. (Olin Compl. ¶ 132.) On October 7, 2010, $500,000 of Olin's previous investments were deposited into the bank account of TSI Holdings, and on January 14, 2014, another $200,000 was deposited into the bank account of TSI Holdings. (Olin Compl. ¶ 133.) Thereafter, like with his investments in Premier Fund, Olin alleges he received "false information and

statements regarding [his] investments[,]" which were routinely sent from MetLife's Wall Street Capitol office to various IRA trustees for reporting to Olin. (Olin Compl. ¶ 138.) Olin alleges that from the early 2000s through November 2016, he received these false investment statements assuring his investments were safe and documenting funds and earnings that did not exist, and that he believed that these statements were from MetLife. (Olin Compl. ¶¶ 161, 162.) Olin alleges that as early as 2002, MetLife knew that Siskey was using Premier Fund and Premier Fund II illegally but omitted these facts when communicating to Olin through these periodic financial statements. (Olin Compl. ¶¶ 126, 139.)

68. In addition to the false financial statements, Olin alleges that from 2000 through 2016, Lowder and Hammond met with Siskey and Olin "regularly" and were present when Siskey misrepresented the status of Olin's investments. (Olin Compl. ¶ 146.) Lowder and Hammond used these meetings to sell Olin and his wife MetLife insurance. (Olin Compl. ¶ 146.) Specifically, on May 5, 2011, Lowder advised Olin to purchase a $100,000 MetLife life insurance policy, which Olin did. (Olin Compl. ¶ 147.) Then on or about July 7, 2013, Hammond advised Olin and his wife to purchase a $10,000 MetLife annuity contract, which they did. (Olin Compl. ¶ 148.) Again on March 3, 2014, Lowder advised Olin to purchase another $200,000 MetLife life insurance policy, which he did. (Olin Compl. ¶ 149.)

69. Based on "further false representations" of Siskey, Lowder, and Hammond, Olin invested an additional $200,000 in Siskey Capitol (now Stone Street Partners).

(Olin Compl. ¶ 136.) These funds were invested in shares of stock in LBI. (Olin Compl. ¶ 136.)

70. Rather than investing Olin's funds in TSI Holdings, Siskey withdrew funds from the company's bank account and converted them for his own use or to pay other investors who requested distributions. (Olin Compl. ¶ 134.) As a result, Olin's investment in TSI Holdings is now subject to *pro rata* distribution in Bankruptcy Court. (Olin Compl. ¶ 135.) Olin also alleges that he based his taxes on the false investment statements from Siskey, Lowder, Hammond, and MetLife, and therefore paid income taxes on funds that did not exist. (Olin Compl. ¶ 162.) With respect to his investment in LBI, Olin alleges that because Stone Street Partners has been "effectively destroyed" by "the taint of Siskey's fraud[,]" his investment has been diluted and devalued. (Olin Compl. ¶ 137.)

71. Notwithstanding MetLife's alleged knowledge of Siskey's illegal behavior regarding the Premier Fund and Premier II accounts, and Siskey's other disciplinary history, Olin alleges that MetLife allowed Siskey to continue his "everyday business activities at the MetLife office because Siskey was generating significant profits for MetLife." (Olin Compl. ¶ 142; *see also* ¶ 145.) Olin further states "[u]pon information and belief" that even while suspended, Siskey continued to receive commissions from MetLife for Olin's investments. (Olin Compl. ¶ 143.) Olin also alleges that Lowder and Hammond knew about Siskey's disciplinary history and failed to disclose that information to Olin during any of their communications and dealings. (Olin Compl. ¶ 151.)

72. Olin states that because of MetLife, Lowder, and Hammond's misrepresentations and omissions, he was prevented from and could not have discovered the Investment Ponzi Scheme until December of 2016. (Olin Compl. ¶ 158.) Olin alleges that had he known the truth that Siskey was using Premier Fund to defraud investors, he would not have invested in the company, (Olin Compl. ¶ 125), and had he known of Siskey's violations of law and resulting disciplinary actions, then he would not have invested in TSI and LBI (in addition to Premier Fund). (Olin Compl. ¶ 160.)

F. **Peterson Complaint Allegations**

73. In 2014, Peterson already had an existing brokerage account with MSI and had MetLife insurance policies when Hammond introduced him to Siskey and Wall Street Capitol. (Peterson Compl. ¶¶ 112, 113.) On several dates from 2014 to 2016, Peterson met with Siskey and Hammond at the Wall Street Capitol office. (Peterson Compl. ¶ 114.) On or about December 12, 2014, Peterson met with Hammond and was induced into investing $250,000 in shares of Siskey Capitol Opportunity Fund II, LLC, now known as Stone Street Opportunity Fund II, LLC. (Peterson Compl. ¶ 118.)

74. On October 26, 2015 and July 27, 2016, upon the advice of Hammond, Peterson consulted with Siskey and was induced into investing $100,000 in LBI securities and $100,000 in Kure securities. (Peterson Compl. ¶ 121.) Siskey made numerous misrepresentations and omitted that he had been fined and suspended in 2004 and 2011. (Peterson Compl. ¶ 121.) Hammond was aware of Siskey's violations

of law and the resulting disciplinary actions in 2004 and 2011 but omitted and concealed these material facts from Peterson. (Peterson Compl. ¶¶ 119, 121.) These investments into LBI and Kure are now managed and held by Stone Street Partners and have been "substantially degraded [and are] worth significantly less than they would have been due to 'the taint of Siskey's fraud[.]'" (Peterson Compl. ¶ 121.)

75. On or about April 21, 2016, upon the advice of Hammond, Peterson met with Siskey and was induced into investing $225,000 in SRP. (Peterson Compl. ¶ 122.) Hammond did not mention Siskey's disciplinary history when recommending that Peterson meet with Siskey about further investments. (Peterson Compl. ¶ 122.) With respect to this investment in SRP, Siskey sent Peterson a written misrepresentation that the building SRP owned a 1/3 interest in carried a debt of 5 million dollars, when in fact the building carried 8.25 million dollars in debt. (Peterson Compl. ¶¶ 123–24, 126; Ex. 16.) The building was sold for only $3.3 million, and the Bankruptcy Trustee has determined that Peterson would receive less than half of his investment from the sale proceeds. (Peterson Compl. ¶ 126.)

76. Peterson alleges that had he known of Siskey's disciplinary history—information that the MetLife Defendants and Hammond knew about and did not tell Peterson about—he would not have invested in Siskey Capitol Opportunity Fund II or SRP. (Peterson Compl. ¶¶ 119, 120, 125, 129.)

### G. Williams Complaint Allegations

77. The Williamses became Wall Street Capitol clients in 2016 when Phillips, who at that time was the MetLife insurance broker for J. Williams, introduced the

Williamses to the investment services offered at Wall Street Capitol. (Williams Compl. ¶¶ 114, 115, 132.) On May 31, 2016, Phillips induced each of the Williamses to invest $50,000 in SRP. (Williams Compl. ¶¶ 117, 134.) In getting the Williamses to invest in SRP, Siskey and Phillips misrepresented the value of SRP's 1/3 ownership interest in the Wall Street Capitol building, both orally and in writing. (Williams Compl. ¶¶ 118, 135.) Phillips and Siskey made a written misrepresentation that the Wall Street Capitol building carried a debt of 5 million dollars, when in fact it carried 8.25 million dollars in debt. (Williams Compl. ¶¶ 118, 135.) They also represented that the SRP investment would achieve "[l]iquidity within 6 months (guaranteed by Rick Siskey and Sharon Road Properties)," when in fact the 1/3 interest of SRP sold by the Bankruptcy Trustee for only $3.3 million. (Williams Compl. ¶¶ 118, 135; Exs. 15 & 16.)

78. J. Williams, but not V. Williams, also invested $20,000 in Kure based on representations by Siskey and Phillips that the investment was "guaranteed." (Williams Compl. ¶¶ 120, 122.) From early 2016 through December 2016, Siskey and Phillips provided the Williamses with false periodic statements assuring them that their investments were safe and earning interest. (Williams Compl. ¶¶ 123, 125, 139.) In addition to these written statements, the Williamses also allege that Phillips made "consistent verbal assurances" regarding their investments. (Williams Compl. ¶¶ 125, 141.)

79. The Williamses allege that Phillips and the MetLife Defendants were aware of the disciplinary actions taken against Siskey in 2004 and 2011 and failed to convey

this information to the Williamses at any point prior to and after they invested with Wall Street Capitol. (Williams Compl. ¶¶ 121, 124, 137, 140.) The Williamses also allege that the MetLife Defendants did not tell them about the MetLife Defendants' investigation into Siskey's actions in 2014 or 2015, which revealed many facts of the Investment Ponzi Scheme, and instead concealed that investigation from the Williamses. (Williams Compl. ¶¶ 124, 140.) The Williamses allege that if they had known about Siskey's disciplinary history, they would not have invested in SRP and/or Kure. (Williams Compl. ¶ 129, 145.)

80. The Williamses' investments in SRP are now subject to *pro rata* distributions in Bankruptcy Court and J. Williams's investment in Kure "represents an actual loss and damages to him" because Stone Street Partners, the company that manages the investment, has been "effectively destroyed" due to "the taint of Siskey's fraud." (Williams Compl. ¶¶ 119, 120, 136.)

81. Against these factual allegations asserted in the Complaints, the Court discusses each of the claims sought to be dismissed by Defendants.

## V.    LEGAL STANDARD

82. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (citation omitted). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669,

670, 355 S.E.2d 838, 840 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018). The Court is not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation omitted).

83. Furthermore, the Court may consider documents attached to, specifically referred to, or incorporated in a complaint without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation omitted). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) (citation omitted). However, where the Court considers documents that are *not* specifically referred to, contained in, or attached to the complaint, the Rule 12(b)(6) motion will be converted into a Rule 56 motion and subject to its standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890–91 (1979).

84. Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 821

S.E.2d 729, 736–37 (N.C. 2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).  This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation."  *Id.* at 737 n.7 (citations omitted).

## VI.   ANALYSIS

85.   At the outset, the Court notes that both sides have submitted various documents with their briefing on the Motions that were not attached to or specifically referenced in the Complaints.  The Court makes clear that its analysis is not based on these extrinsic documents.  Thus, the Court

> is not required to convert [the] motion to dismiss into one for summary judgment simply because additional documents are submitted.  Where it is clear from the record, namely from the order itself, that the additional materials were not considered by the trial court, the 12(b)(6) motion is not converted into a Rule 56 motion.

*Estate of Belk v. Boise Cascade Wood Prods., L.L.C.*, 2019 N.C. App. LEXIS 64, at *4 (N.C. Ct. App. Feb. 5, 2019) (internal quotation marks, brackets, and citation omitted).

86.   Moreover, while the Complaints involve substantial overlap, not every complaint attaches or specifically refers to the same documents.  While this Order and Opinion consolidates the Court's decision on the Motions in the interests of judicial efficiency, the Court has considered each complaint, and the allegations therein, in isolation, careful not to let the allegations or documents contained in, or omitted from, other complaints color its analysis.

**A.    Statute of Limitations**

87.    Throughout the Motions, Defendants argue that some[11] of Plaintiffs' claims are time-barred by the applicable statutes of limitations and therefore these claims are subject to dismissal pursuant to Rule 12(b)(6).

88.    "A statute of limitations defense may properly be asserted in a Rule 12(b)(6) motion to dismiss if it appears on the face of the complaint that such a statute bars the claim." *Horton v. Carolina Medicorp.*, 344 N.C. 133, 136, 472 S.E.2d 778, 780 (1996).  Once a statute of limitations issue is properly raised by a defendant, "the burden of showing that the action was instituted within the prescribed period is on the plaintiff." *Id.* (citation omitted).  "A plaintiff sustains this burden by showing that the relevant statute of limitations has not expired." *Id.* (citations omitted).  Even where a defendant's conduct occurred outside the applicable limitations period, it may be subject to a discovery rule, meaning that accrual of the limitations period does not begin when the defendant's conduct occurred, but when the plaintiff discovered it. *See Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 386 (2007).

89.    Plaintiffs' fraud claims are subject to a discovery rule: "For relief on the ground of fraud or mistake; the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." N.C.G.S. § 1-52(9).  Plaintiffs have alleged that they could not have discovered the Ponzi Schemes because of Defendants' actions. (*See, e.g.*, J. Aldridge

---

[11] Plaintiffs' constructive fraud claims are subject to a ten-year statute of limitations, N.C.G.S. § 1-56, and Defendants do not challenge Plaintiffs' constructive fraud claims as being time-barred.

Compl. ¶ 163, K. Aldridge Compl. ¶ 156; Goulet Compl. ¶ 179; Kelly Compl. ¶ 294; Olin Compl. ¶ 158; Peterson Compl. ¶ 179; Williams Compl. ¶ 195.) In light of these allegations and the existence of an applicable discovery rule, the Court cannot conclude, at this time, that Plaintiffs' fraud-based claims are time-barred.

90. On a Rule 12(b)(6) motion, the Court evaluates the facts in the light most favorable to Plaintiffs, even when the limitations period is called into question by Defendants. *Sparrow Sys. v. Private Diagnostic Clinic, PLLC*, 2014 NCBC LEXIS 70, at *30 (N.C. Super. Ct. Dec. 24, 2014) (citing *Brooks v. Ervin Constr. Co.*, 253 N.C. 214, 219, 116 S.E.2d 454, 459 (1960)). Whether Plaintiffs need to prove that they could not have discovered the existence of the Ponzi Schemes earlier is a question for a different day, and presumably one for the factfinder or for the Court on a more developed record. *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 486, 593 S.E.2d 595, 601 (2004) ("[D]etermining when plaintiff should, in the exercise of reasonable care and due diligence, have discovered the [alleged] fraud is a question of fact to be resolved by the jury.").

91. Plaintiffs' NCSA claims and Olin's NCIAA claim are subject to a discovery rule with one caveat. Section 78A-56(f) provides:

> No person may sue [for violation of the NCSA] more than three years after the person discovers facts constituting the violation, *but in any case no later than five years after the sale or contract of sale, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation* or induces the person to forgo or postpone commencing an action based upon the violation, the suit may be commenced *not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful.*

N.C.G.S. § 78A-56(f) (emphasis added)

92. Likewise, section 78C-38(d) provides:

No person may sue [for violation of the NCIAA] more than three years after the person discovers facts constituting the violation, *but in any case no later than five years after the rendering of investment advice, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation* or induces the person to forgo or postpone commencing an action based upon the violation, the suit may be commenced *not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful.*

*Id.* § 78C-38(d) (emphasis added).

93. Both the NCSA and the NCIAA create a private right of action for persons injured from the sale of securities or the rendering of investment advice. Generally, the suit must be initiated within five years following the sale or the rendering of the investment advice regardless of when the plaintiff discovered the violation. However, where the plaintiff alleges that the defendant acted fraudulently or deceitfully in concealing a violation of the NCSA or NCIAA, a discovery rule applies, and the five-year limitation does not necessarily bar the plaintiff's ability to bring the claim.

94. Plaintiffs invested with Wall Street Capitol through Siskey and the Individual Defendants at various times from 2000 through 2016, and accordingly, some Plaintiffs' claims could fail under the five-year limitations period set forth in the NCSA and NCIAA. However, each Plaintiff alleges that Defendants actively concealed the Investment Ponzi Scheme, (*see, e.g.,* J. Aldridge Compl. ¶ 67; K. Aldridge Compl. ¶ 68; Goulet Compl. ¶ 67; Kelly Compl. ¶ 72; Olin Compl. ¶ 73; Peterson Compl. ¶ 67; Williams Compl. ¶ 69), and it is Plaintiffs' alleged harm arising from the Investment Ponzi Scheme that supports their NCSA (and Olin's NCIAA)

claims. Therefore, at this time, the Court cannot conclude from the face of the Complaints that Plaintiffs' NCSA claims and Olin's NCIAA claim are time-barred.

95. As to those claims to which a discovery rule does not apply (the negligent supervision claims against the MetLife Defendants and professional negligence claims against the Individual Defendants), a fair reading of the Complaints indicates that Defendants' actionable conduct could have occurred within the applicable limitations period. Plaintiffs allege that Defendants' actions and inactions amounting to negligence extended through December 2016. (*See* J. Aldridge Compl. ¶ 236; K. Aldridge Compl. ¶ 223; Goulet Compl. ¶ 191; Kelly Compl. ¶ 306; Olin Compl. ¶ 235; Peterson Compl. ¶ 191; Williams Compl. ¶ 207.) The Complaints were filed in 2018, therefore within the three-year limitations period. N.C.G.S. §§ 1-52(1), (5). Although Plaintiffs' allegations paint broad strokes as to when Defendants specifically acted or failed to act, on a Rule 12(b)(6) motion, the Court considers whether there is a statute of limitations issue presented *on the face* of the Complaints. *See Horton*, 344 N.C. at 136, 472 S.E.2d at 780. Plaintiffs' generality does not create a clear statute of limitations issue. Accordingly, the Court concludes that the Complaints do not reveal on their face that Plaintiffs' claims are barred by the applicable limitations period.

96. For these reasons, the Court declines to dismiss any of Plaintiffs' claims as time-barred. The Motions, therefore, are DENIED to the extent they seek dismissal on these grounds. The Court's conclusion in this regard is without prejudice to Defendants raising the applicable statutes of limitations as affirmative defenses in

their respective pleadings and asserting these defenses at a procedurally appropriate stage upon a more fully developed record.

97. Having concluded that no claims are time-barred on the face of the various Complaints, the Court turns to the substantive arguments raised by Defendants regarding each of Plaintiffs' claims in the Complaints.

## B. Respondeat Superior (against the MetLife Defendants)

98. The Court begins with Plaintiffs' stand-alone cause of action for vicarious liability/respondeat superior against the MetLife Defendants. Plaintiffs allege that the MetLife Defendants should be vicariously liable for Siskey and the Individual Defendants' actions and inactions at Wall Street Capitol. Specifically, Plaintiffs allege that liability for their claims of fraud, constructive fraud, violation of the NCSA (and NCIAA in the Olin Complaint), and UDTP against the Individual Defendants extends to MetLife on the basis of *respondeat superior*. (J. Aldridge Compl. ¶ 251; K. Aldridge Compl. ¶ 238; Goulet Compl. ¶ 206; Kelly Compl. ¶ 321; Olin Compl. ¶ 247; Peterson Compl. ¶ 206; Williams Compl. ¶ 222.) Though Plaintiffs do not bring any claims directly against Siskey, they seek to hold the MetLife Defendants liable for Siskey's conduct as well. (J. Aldridge Compl. ¶ 251; K. Aldridge Compl. ¶ 238; Goulet Compl. ¶ 206; Kelly Compl. ¶ 321; Olin Compl. ¶ 247; Peterson Compl. ¶ 206; Williams Compl. ¶ 222.)

99. "When an employee commits a tort while acting within the scope of his employment, the tort can be imputed to the employer under the doctrine of *respondeat superior*." *Estate of Redding v. Welborn*, 170 N.C. App. 324, 330, 612 S.E.2d 664, 668

(2005). "It is elementary that the principal is liable for the acts of his agent, whether malicious or negligent, . . . when the agent or servant is acting within the line of his duty and exercising the functions of his employment." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 297, 603 S.E.2d 147,157 (2004) (quoting *Thrower v. Coble Dairy Prods. Coop., Inc.*, 249 N.C. 109, 111–12, 105 S.E.2d 428, 430 (1958)).

100. As a threshold matter, the MetLife Defendants argue that they cannot be held vicariously liable for any alleged act by Siskey because Plaintiffs have not named Siskey (or his estate) as a defendant. In support, the MetLife Defendants cite *Barnes v. McGee*, 21 N.C. App. 287, 289−90, 204 S.E.2d 203, 205 (1974). *Barnes* stands for the proposition that where a plaintiff has sued both the agent and the principal, and then the plaintiff's claim against the agent is dismissed "with prejudice," the claim against the principal must also be dismissed. The Court of Appeals did not hold that asserting a claim against an agent is a necessary prerequisite to asserting a claim against that agent's principal based on vicarious liability. Accordingly, the Court considers Plaintiffs' vicarious liability claim notwithstanding Plaintiffs' decision not to sue Siskey's estate and addresses the MetLife Defendants' other arguments challenging this theory of liability.

101. The MetLife Defendants next contend that they cannot be held vicariously liable for Siskey's actions and inactions because he was an independent contractor for MetLife. "Generally, whether one is an independent contractor or an agent or employee is a mixed question of law and fact." *Deyton v. Estate of Waters*, 2013 NCBC LEXIS 19, at *34 (N.C. Super. Ct. Apr. 25, 2013). Only "[w]here the facts are

undisputed or the evidence is susceptible of only a single inference and a single conclusion, it is a question of law for a court whether one is an employee or an independent contractor[.]" *Id.*

102. The Court believes that Plaintiffs have sufficiently alleged an employer-employee relationship between Siskey and the MetLife Defendants. While Plaintiffs note that Siskey and the MetLife Defendants entered into new employment contracts in 2011 and 2013 stating that Siskey was an "independent contractor[,]" Plaintiffs allege that this was "an attempt by MetLife to defraud the public . . . and an inaccurate characterization of the relationship between Siskey and MetLife." (J. Aldridge Compl. ¶ 88; K. Aldridge Compl. ¶ 89; Goulet Compl. ¶ 88; Kelly Compl. ¶ 93; Olin Compl. ¶ 93; Peterson Compl. ¶ 88; Williams Compl. ¶ 90.) In support of this position, Plaintiffs assert that Siskey continued to do the same work he had always done at MetLife, indicating that this work was "an integral part of the business of MetLife [and that] the relationship had been permanent for many years." (J. Aldridge Compl. ¶ 89; K. Aldridge Compl. ¶ 90; Goulet Compl. ¶ 89; Kelly Compl. ¶ 94; Olin Compl. ¶ 94; Peterson Compl. ¶ 89; Williams Compl. ¶ 91.) Moreover, Plaintiffs allege that the MetLife Defendants provided the facilities and equipment used by Siskey, had supervision and control of him, required him to follow MetLife policies, and had to approve certain paperwork and transactions he undertook. (J. Aldridge Compl. ¶ 89.) Further, Plaintiffs allege that Siskey "did not have the freedom to adopt certain methods of doing work over MetLife's compliance rules and policies[.]" (J. Aldridge Compl. ¶¶ 89–90; K. Aldridge Compl. ¶ 90–91; Goulet Compl. ¶¶ 89–90; Kelly Compl.

¶¶ 94–95; Olin Compl. ¶¶ 94–95; Peterson Compl. ¶¶ 89–90; Williams Compl. ¶¶ 91–92.)

103. Taking Plaintiffs' allegations as true, as the Court must do on a motion to dismiss, Plaintiffs have sufficiently pleaded that Siskey was an employee of the MetLife Defendants. Furthermore, because Plaintiffs call into question the motive behind the MetLife Defendants' 2011 and 2013 contracts with Siskey, and moreover do not attach or otherwise specifically incorporate those agreements into the Complaints, the Court does not consider the MetLife Defendants' arguments as to the contents of those agreements.

104. Alternatively, and with respect to any claims alleged against the Individual Defendants, the MetLife Defendants argue that they cannot be held vicariously liable for actions taken outside the scope of their employees' authorized duties. The MetLife Defendants argue that the activities conducted at Wall Street Capitol were private matters that personally benefitted Siskey, not the MetLife Defendants.

105. First, this analysis goes beyond the allegations contained in the four corners of the Complaints and is therefore not appropriate on the Court's consideration of the Rule 12(b)(6) motions. Plaintiffs have alleged that the Individual Defendants were MetLife employees working at MetLife's Wall Street Capitol office. Plaintiffs have alleged that signage outside and inside the Wall Street Capitol office reinforced their belief that, at all times, Plaintiffs were engaging with MetLife agents and that they received documents and statements they believed were from MetLife. Plaintiffs further allege that the MetLife Defendants benefitted from the Individual

Defendants' conduct because it brought in new MetLife insurance customers. Accordingly, the Individual Defendants' and Siskey's actions were "conceivably" within the scope of their employment with the MetLife Defendants. Any analysis beyond this is improper for the Court on Rule 12(b)(6) motions. *See Medlin v. Bass*, 327 N.C. 587, 593, 398 S.E.2d 460, 464 (1990) ("Where the employee's actions conceivably are within the scope of employment and in furtherance of the employer's business, the question is one for the jury.").

106. The MetLife Defendants nevertheless argue that "intentional tortious acts are rarely considered to be within the scope of an employee's employment." *Id.* (internal quotations omitted). However, *Medlin* and the cases cited therein are distinguishable.

107. In *Medlin*, our Supreme Court addressed whether summary judgment was appropriate in an action against the Franklin County Board of Education, the superintendent, and various other school personnel in a sexual assault case brought by the mother of a student allegedly sexually assaulted by her school principal. The question presented was whether school personnel could be held vicariously liable for the principal's sexual assault. *Id.* at 589, 398 S.E.2d at 461. The Supreme Court reasoned that,

> [i]f an assault is committed by the servant, not as a means or for the purpose of performing the work he was employed to do, but in a spirit of vindictiveness or to gratify his personal animosity or to carry out an independent purpose of his own, then the master is not liable.

*Id.* at 594, 398 S.E.2d at 464 (quoting *Robinson v. McAlhaney*, 214 N.C. 180, 183, 198 S.E. 647, 650 (1938)).

108. Upon an appeal from summary judgment for the defendants, the Supreme Court agreed with the trial court that a sexual assault committed by a principal "clearly . . . fall[s] in the category of intentional tortious acts designed to carry out an independent purpose of [the principal's] own, and they were thus not within the course and scope of his employment with [the Board of Education]." *Id.*

109. Aside from its different procedural posture, the facts in *Medlin* are also vastly different from those alleged here. Plaintiffs allege that the MetLife Defendants benefitted from the fraud alleged in the Complaints by either (1) Siskey and the Individual Defendants securing new insurance business for MetLife or (2) the Individual Defendants "helping" to fraudulently obtain premiums for MetLife's policies. Plaintiffs allege that the MetLife Defendants continued their employment relationship with Siskey, despite knowledge of his disciplinary history and suspensions, because he was an asset to their business. Upon these facts, the Court cannot conclude on Rule 12(b)(6) motions that Siskey and the Individual Defendants' actions were "in a spirit of vindictiveness or to gratify . . . personal animosity or to carry out an independent purpose of [their] own." *Id.* at 398 S.E.2d at 464 (quoting *Robinso*n, 214 N.C. at 183, 198 S.E. at 650).

110. Therefore, the Court DENIES the MetLife Motions to the extent they seek dismissal of any claim premised on vicarious liability.

### C. Constructive Fraud (against all Defendants)

111. Plaintiffs bring constructive fraud claims against all Defendants, alleging that as either insurance or investment customers of MetLife (or both), they had a

"relationship of trust and confidence" with Defendants, which led Plaintiffs to purchase investments and insurance products. (J. Aldridge Compl. ¶¶ 192−93 (as to Lowder and the MetLife Defendants); K. Aldridge Compl. ¶¶ 179−80 (as to Lowder, Hammond, and the MetLife Defendants); Goulet Compl. ¶¶ 147−48 (as to Hammond and the MetLife Defendants); Kelly Compl. ¶¶ 262−63 (as to Phillips and the MetLife Defendants); Olin Compl. ¶¶ 179−80 (as to Lowder and the MetLife Defendants); Peterson Compl. ¶¶ 147−48 (as to Hammond and the MetLife Defendants); Williams Compl. ¶¶ 163−64 (as to Phillips and the MetLife Defendants).)

112. Plaintiffs allege that Defendants took advantage of Plaintiffs' trust and confidence by making false statements and omitting material facts, which Plaintiffs allege they did to benefit themselves in procuring Plaintiffs' investments with Wall Street Capitol and/or Plaintiffs' purchases of MetLife life insurance policies. (J. Aldridge Compl. ¶ 195; K Aldridge Compl. ¶ 182; Goulet Compl. ¶ 150; Kelly Compl. ¶ 165; Olin Compl. ¶ 182; Peterson Compl. ¶ 150; Williams Compl. ¶ 166.) Specifically, Plaintiffs allege that the Individual Defendants "sought to earn commissions and continue to receive fees from Siskey[,]" and that the MetLife Defendants "sought to continue to earn profits from Siskey's sales despite his multiple violations of law and industry standards." (J. Aldridge Compl. ¶ 195; K. Aldridge Compl. ¶ 182; Goulet Compl. ¶ 150; Kelly Compl. ¶ 165; Olin Compl. ¶ 182; Peterson Compl. ¶ 150; Williams Compl. ¶ 166.)

113. A constructive fraud claim requires a plaintiff to show (1) that the defendant owes the plaintiff a fiduciary duty, (2) that the defendant breached that

duty; and (3) that the defendant sought to benefit himself in the transaction. *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620, 730 S.E.2d 763, 767 (2012); *White*, 166 N.C. App. at 294, 603 S.E.2d at 156. "A claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud[,]" and accordingly does not need to meet the Rule 9(b) pleading requirement. *Hunter*, 162 N.C. App. at 482, 593 S.E.2d at 599. Defendants challenge Plaintiffs' constructive fraud claims on either the first element (fiduciary relationship) and the third element (benefit received), or both.

114. The Court notes, however, that pursuant to its earlier Rule 12(b)(1) Order and Opinion, K. Aldridge, the Lemonses, and V. Williams lack standing to assert their constructive fraud claims against the MetLife Defendants, and the Court need not, and does not, evaluate the sufficiency of their constructive fraud claims sought directly against the MetLife Defendants. *See Aldridge*, 2019 NCBC LEXIS 53, at *73. Should K. Aldridge's, the Lemonses', and V. Williams's claims against the Individual Defendants proceed as to these plaintiffs, then these plaintiffs will only be able to pursue their constructive fraud claims against the MetLife Defendants on the basis of *respondeat superior*.

### 1. Fiduciary Relationship

115. To plead a claim for constructive fraud, a plaintiff must allege that a fiduciary relationship existed between the parties. *See White*, 166 N.C. App. at 294, 603 S.E.2d at 156; *Dalton v. Camp*, 353, N.C. 647, 651, 548 S.E.2d 704, 707 (2001). A fiduciary relationship "exists in all cases where there has been a special confidence

reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Lockerman v. S. River. Elec. Membership Corp.*, 794 S.E.2d 346, 351 (N.C. Ct. App. 2016). "In North Carolina, a fiduciary duty can arise by operation of law (*de jure*) or based on the facts and circumstances (*de facto*) . . . ." *Id.* "The standard for finding a *de facto* fiduciary relationship is a demanding one[.]" *Lockerman*, 794 S.E.2d at 342. "Only when one party figuratively holds all of the cards—all of the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008). "Determining whether a fiduciary relationship exists requires looking at the particular facts and circumstances of a given case." *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 42, 742 S.E.2d 287, 292 (2013).

116. The Individual Defendants (as to all Plaintiffs) and the MetLife Defendants (as to Goulet, Peterson, Kelly, Leite, and Reittinger) argue in their respective motions that there is no basis under North Carolina law to recognize a *de jure* fiduciary relationship here. The Court agrees.

117. As this Court has previously stated, there is "no case law to support the theory that managing broker-dealers owe fiduciary duties to investors. Indeed, the North Carolina Supreme Court has declined to find a fiduciary relationship in arm's-length borrower-lender transactions." *NNN Durham Office Portfolio 1, LLC v. Grubb & Ellis Co.*, 2016 NCBC LEXIS 95, at *99 (N.C. Super. Ct. Dec. 5, 2016) (citing

*Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 368, 760 S.E.2d 263, 266–67 (2014)). *See also Fekety v. Gruntal & Co.*, 191 A.D.2d 370, 371 (N.Y. App. Div. 1993) ("[A] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities."). Accordingly, the Court concludes that Plaintiffs have not alleged the existence of a *de jure* fiduciary relationship here—between Plaintiffs and Siskey and/or the Individual Defendants or as to the MetLife Defendants on either a direct or indirect theory of liability as the financial institution that employs Siskey and the Individual Defendants.

118. Neither have Plaintiffs alleged facts sufficient to support a *de facto* fiduciary relationship. As stated above, the standard for alleging a *de facto* fiduciary relationship is demanding, requiring one party to "figuratively hold all the cards[,]" which is something that has not been pleaded in any of the Complaints. There are no allegations regarding the degree, or lack thereof, that Plaintiffs had control over their accounts or how much control they gave to Siskey or the Individual Defendants.

119. In limited circumstances, this Court has found that an investor relationship could give rise to a *de facto* fiduciary relationship. *See White*, 166 N.C. App. at 293, 603 S.E.2d at 155. In *White*, the plaintiffs, an older married couple who used their son as their investment advisor, had no experience or familiarity with financial matters. *Id.* The plaintiffs in *White* pled that "because of [their] lack of expertise in financial affairs,' they relied upon [their son and his employer, Consolidated Planning] to properly manage their funds." *Id.*

120. Here, none of the Plaintiffs have pleaded that they lacked financial sophistication or have otherwise alleged the vulnerability required to suggest a *de facto* fiduciary relationship between them and Siskey or the Individual Defendants, or between them and the MetLife Defendants (either directly or indirectly). There are no allegations that Siskey or the Individual Defendants had any sort of "domination" over Plaintiffs, *see Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266, or that they held all Plaintiffs' "technical information" such that they had to rely exclusively on their investment advisors' advice and actions. These pleading deficiencies are fatal to Plaintiffs' constructive fraud claims.

121. Accordingly, Plaintiffs' constructive fraud claims are DISMISSED against the Individual Defendants. Because Plaintiffs have no surviving claim against the Individual Defendants on this basis, and have not alleged any additional facts to support the existence of a fiduciary relationship between Plaintiffs and Siskey, the MetLife Defendants cannot be held vicariously liable for Siskey or the Individual Defendants' alleged constructive fraud. Because K. Aldridge, the Lemonses, and V. Williams lack standing to bring their constructive fraud claims directly against the MetLife Defendants, and have failed to extend liability to the MetLife Defendants on the basis of vicarious liability, these three plaintiffs' constructive claims are entirely DISMISSED.

122. In addition, Goulet, Olin, Peterson, Kelly, Leite, and Reittinger's constructive fraud claims brought directly against the MetLife Defendants are also

entirely DISMISSED for failure to sufficiently plead a fiduciary relationship between the MetLife Defendants and these plaintiffs.

### 2. Benefit Sought

123. The MetLife Defendants do not challenge the existence of a fiduciary relationship between them and J. Aldridge and J. Williams. Rather, they contend that these two plaintiffs failed to allege that the MetLife Defendants sought their own benefit in the relevant investment and insurance transactions.

124. To plead the third element of a claim for constructive fraud, a plaintiff must allege that the defendant took "advantage of his position of trust to the hurt of plaintiff" and sought "his own advantage in the transaction." *Barger*, 346 N.C. at 666, 488 S.E.2d at 224. "The benefit sought by the defendant must be more than a continued relationship with the plaintiff." *Sterner v. Penn*, 159 N.C. App. 626, 631, 583 S.E.2d 670, 674 (2003) (quoting *Barger*, 346 N.C. at 667, 488 S.E.2d at 224). Further, "payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage in the transaction." *NationsBank v. Parker*, 140 N.C. App. 106, 114, 535 S.E.2d 597, 602 (2000).

125. Here, J. Aldridge and J. Williams each allege that the MetLife Defendants "sought to benefit themselves in the investment transactions and purchases of life insurance . . . [by] continu[ing] to earn profits from Siskey's sales despite his multiple violations of law and industry standards." (J. Aldridge Compl. ¶ 195; Williams Compl. ¶ 166.) These plaintiffs plead that part of the Investment Ponzi Scheme was

that money collected from the scheme was used to pay MetLife's insurance premiums on those insurance contracts acquired through the Insurance Ponzi Scheme. The Court understands the basic structure of the Investment Ponzi Scheme as this: Siskey would sell an insurance customer an insurance policy, falsely representing it as a whole life policy when it was actually a term policy, and tell the insurance customer that he no longer had to pay premiums. Then, Siskey would take money from the Ponzi Entities to pay the premiums on those falsely represented policies to the MetLife Defendants. This is sufficient to show not only that the MetLife Defendants benefitted under this scheme but also had a motive to "omit" and "conceal" Siskey's fraud.

126. J. Aldridge and J. Williams do not plead with particularity which of their investments went to which insurance contracts to create a direct connection between their harm and the MetLife Defendants' gain; however, the very nature of a Ponzi scheme means that tracing where certain monies went and when is difficult, if not impossible, at this stage. Moreover, J. Aldridge and J. Williams need not plead their constructive fraud claims with particularity. Accordingly, J. Aldridge and J. Williams have sufficiently pleaded their constructive fraud claims premised on their loss of investments.

127. In addition, J. Aldridge has sufficiently pleaded his constructive fraud claim based on his loss of his insurance policies. While "[t]he benefit sought by the defendant must be more than a continued relationship with the plaintiff[,]" *Sterner*, 159 N.C. App. at 631, 583 S.E.2d at 674, the rationale behind this principle is that

"[p]resumably, [the] defendant[] would have obtained the benefit of a continued relationship with [the plaintiff] equally by providing accurate information . . . ." *NationsBank v. Parker*, 140 N.C. App. 106, 114, 535 S.E.2d 597, 602 (2000). Here, J. Aldridge's allegations are that the MetLife Defendants received premiums on J. Aldridge's policies because he was fraudulently induced to purchase them in the first place. Accordingly, the MetLife Defendants would not have received these premiums, or J. Aldridge's business in general, if it were not for Siskey and the MetLife Defendants' alleged fraudulent acts and omissions.

128. Accordingly, only J. Aldridge's and J. Williams's constructive fraud claims survive dismissal as to the MetLife Defendants. The Motions are otherwise GRANTED in this regard and Plaintiffs' constructive fraud claims are otherwise DISMISSED.

### D. Fraud (against all Defendants)

129. Plaintiffs assert claims for fraud based on Defendants' alleged affirmative misrepresentations of material fact and fraudulently omitted and concealed material facts. Specifically, Plaintiffs advance their fraud claims against the Individual Defendants for their actions and inactions that led Plaintiffs to invest with Wall Street Capitol. Though not entirely clear, it appears that Plaintiffs attempt to hold the MetLife Defendants liable both directly (based on their alleged affirmative misrepresentations and omissions) and indirectly (based on the actions and inactions of Siskey and the Individual Defendants).

130. To sufficiently plead their claims for fraud, Plaintiffs must allege "(1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party." *Rider v. Hodges*, 255 N.C. App. 82, 88, 804 S.E.2d 242, 248 (2017) (quoting *Forbis*, 361 N.C. at 526–27, 649 S.E.2d at 388). North Carolina permits fraud claims to be based on either affirmative misrepresentations or by concealment or nondisclosure of material facts. *See Kron Medical Corp. v. Collier Cobb & Assoc., Inc.*, 107 N.C. App. 331, 339, 420 S.E.2d 192, 197 (1992) (citing *Rosenthal v. Perkins*, 42 N.C. App. 449, 452, 257 S.E.2d 63, 66 (1979)). Plaintiffs bring their fraud claims based on both theories, and Defendants raise different arguments as to each.

131. Fraud claims based on both theories must be pleaded with particularity pursuant to Rule 9(b). N.C.G.S. § 1A-1, Rule 9(b). Defendants move to dismiss all of the fraud claims for failure to meet this heightened pleading standard. Particularity is a threshold question; accordingly, the Court analyzes Plaintiffs' conformity with Rule 9(b) first.

### 1. Rule 9(b) Analysis – Affirmative Misrepresentations

132. Where the claim arises by affirmative misrepresentation, a plaintiff "must allege (1) the time, place and content of the misrepresentation, (2) the identity of the person making the representation and (3) what was obtained as a result of the fraudulent acts or representations" in order to sufficiently plead his or her claim. *Deluca v. River Bluff Holdings II*, 2015 NCBC LEXIS 12, at *21 (N.C. Super. Ct. Jan.

28, 2015) (internal quotation marks, brackets, and citation omitted). The alleged misrepresentations must also be "definite and specific," meaning that they must be "more than 'mere puffing, guesses, or assertions of opinions' but actual representations of material facts." *Id.* (quoting *Rowan County Bd. of Educ. v. U.S. Gypum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 659 (1992)).

133. The Court begins its Rule 9(b) analysis by noting that Plaintiffs appear to bring their fraud claims directly against the MetLife Defendants because MetLife sent Plaintiffs false investment statements for many years and "affirmatively [made] false representations to [Plaintiffs] and other customers that the employees in the office, including [the Individual Defendants], were trusted and reputable" or "tout[ed] [Siskey] as a trusted investment advisor." (J. Aldridge Compl. ¶ 182; K. Aldridge Compl. ¶ 169; Goulet Compl. ¶ 139; Kelly Compl. ¶ 254; Olin Compl. ¶ 171; Peterson Compl. ¶ 139; Williams Compl. ¶ 155.) Other than these bare assertions, there are no factual allegations connecting the MetLife Defendants to any direct investment statements prepared or sent to Plaintiffs, nor are there any allegations regarding when or in what context the MetLife Defendants represented to Plaintiffs that Siskey and/or the Individual Defendants were trusted and reputable. Therefore, Plaintiffs have failed to plead with sufficient particularity any direct claim for fraud against the MetLife Defendants. As a result, Plaintiffs' fraud claims against the MetLife Defendants based on any alleged affirmative misrepresentations made by them are DISMISSED.

134. For the rest of the allegations giving rise to Plaintiffs' fraud claims, the Court separately sets forth its analysis and resulting conclusion as to the sufficiency of each Complaint.

### a.   *J. Aldridge*

135. J. Aldridge bases his fraud claim in part on "multiple false representations of material fact" made by Lowder. (J. Aldridge Compl. ¶ 177.) Reading the Complaint in the light most favorable to J. Aldridge, he also appears to assert his fraud claim against the MetLife Defendants on the basis of *respondeat superior* for both Siskey's and Lowder's misrepresentations. (J. Aldridge Compl. ¶ 253.) J. Aldridge alleges wrongs committed by Siskey, Lowder, and the MetLife Defendants based on both the Investment Ponzi Scheme and the Insurance Ponzi Scheme. The Court addresses each set of allegations in turn.

136. With respect to Lowder, for the vast majority of his alleged investments, J. Aldridge has failed to plead his claim with the required specificity. J. Aldridge alleges Lowder misrepresented that his investments in the Ponzi Entities were with legitimate companies and were "guaranteed" safe asset-backed investments with a "fixed rate" of return. (J. Aldridge Compl. ¶¶ 126, 178.) J. Aldridge alleges that these representations were made with the intent to induce him to invest his money in the Ponzi Entities in order for Lowder to "earn a commission." (J. Aldridge Compl. ¶ 178.) J. Aldridge does not connect these misrepresentations to specific investments, nor does he allege when the statements were made, other than generally asserting they were made over a fifteen-year time span. (*See* J. Aldridge Compl. ¶¶ 123, 140.) J.

Aldridge invested in over ten different companies through Wall Street Capitol during his more than a decade-long relationship with the company. Without specifying to which investments these statements were made and when, the J. Aldridge Complaint does not put Lowder on notice of these allegations brought against him.

137. However, elsewhere in his complaint, J. Aldridge alleges that "[o]n September 11, 2014, upon the advice of Rick Siskey and Ben Lowder, [J. Aldridge] gave Ben Lowder the sum of $50,000.00 in cash and was told [by both Siskey and Lowder] that there was a 4% guaranteed rate of return for the investment [in SPP]." (J. Aldridge Compl. ¶¶ 134–35.) This allegation satisfies the Rule 9(b) pleading requirement. Therefore, Lowder's motion to dismiss is DENIED to the extent it seeks dismissal of J. Aldridge's fraud claim against him based on this affirmative misrepresentation. Because J. Aldridge has specifically alleged his fraud claim against Lowder, his fraud claim brought against the MetLife Defendants on the basis of *respondeat superior* survives as well and the corresponding MetLife Motion is DENIED on that ground.

138. Likewise, J. Aldridge has pleaded with particularity statements made by Siskey which could support the imposition of vicarious liability on the MetLife Defendants. Though none of Siskey's alleged misrepresentations are identified in the section of the J. Aldridge Complaint averring fraud, (*see* J. Aldridge Compl. ¶¶ 176–90), the Court nonetheless considers the misrepresentations pleaded in other sections of the complaint. J. Aldridge alleges that Siskey told him in 2001 that he had to "pull out shares and cash out shares from the sale of The Premier Fund to transfer to WSC

Holdings," and that by doing so, there would be "no risk" and J. Aldridge would make a ten percent return on any transfers of funds. (J. Aldridge Compl. ¶¶ 131–32.) This statement has been pleaded with particularity. Accordingly, the MetLife Motion seeking to dismiss J. Aldridge's fraud claim is DENIED in that respect.

140. J. Aldridge also supports his fraud claim against Lowder and the MetLife Defendants on the basis of J. Aldridge's insurance dealings with Siskey. (J. Aldridge Compl. ¶¶ 180, 185–86.) First, as to Lowder, the allegations under J. Aldridge's fraud claim heading do not identify any specific affirmative misrepresentations made by Lowder regarding J. Aldridge's insurance contracts. J. Aldridge does, however, allege elsewhere in his complaint that "Siskey and . . . Lowder made materially false representations to [J. Aldridge], when *he* provided quotes for at least one of the new MetLife policies, stating it was a whole life policy when in fact it was a term policy of much lesser value." (J. Aldridge Compl. ¶ 146 (emphasis added).) A fair reading of the J. Aldridge Complaint indicates that the "he" in this allegation refers to Siskey. Therefore, as to Lowder, this allegation lacks the particularity required by Rule 9(b), and there are no other specific allegations to impose liability on Lowder for J. Aldridge's insurance dealings. Accordingly, neither Lowder nor the MetLife Defendants—on the basis of vicarious liability for Lowder's actions—can be held liable for J. Aldridge's alleged injury from the Insurance Ponzi Scheme.

140. However, the Court concludes that J. Aldridge has pleaded with sufficient particularity *Siskey's* false statements that induced J. Aldridge to surrender his non-MetLife insurance policies in favor of MetLife policies, and thereafter take out

additional MetLife policies. J. Aldridge's allegations against Siskey in this regard spans several pages, setting forth when, where, and how Siskey engaged with J. Aldridge regarding his MetLife insurance policies. At this time, the Court concludes these allegations are sufficient to withstand Rule 9(b) scrutiny and can support imposing vicarious liability upon the MetLife Defendants.[12]

141. In sum, the Court concludes that J. Aldridge's fraud claim premised on Lowder's affirmative misrepresentations regarding J. Aldridge's investments—and vicarious liability extending to the MetLife Defendants on that basis—survives dismissal at this time. J. Aldridge's fraud claim against the MetLife Defendants premised on Siskey's insurance dealings with J. Aldridge also survives dismissal. The Motions are therefore DENIED in that regard. However, J. Aldridge has not pleaded with sufficient particularity any affirmative misrepresentation by Lowder regarding J. Aldridge's insurance dealings.

   b.    *K. Aldridge*

142. K. Aldridge bases her fraud claim on "multiple false representations of material fact" made by Lowder and Hammond. (K. Aldridge Compl. ¶ 165.) Reading the K. Aldridge Complaint in the light most favorable to her, K. Aldridge also appears to base her fraud claim against the MetLife Defendants on the basis of *respondeat*

---

[12] The MetLife Defendants argue that J. Aldridge's underlying insurance documents contradict his allegations regarding these policies. In support, they attach "complete" versions of J. Aldridge's policies and compare them to the allegations. In response, J. Aldridge calls into question the documents' authenticity. Because J. Aldridge does not admit that the documents attached to the MetLife Defendants' briefing are, in fact, the documents that support his allegations, the Court should not, and therefore does not, consider them in deciding the MetLife Defendants' motion. *See Edwards v. Vanguard Fiduciary Tr. Co.*, 2018 NCBC LEXIS 237, at *12 (N.C. Super. Ct. Dec. 21, 2018).

*superior* for both Siskey's and Lowder's misrepresentations. (K. Aldridge Compl. ¶ 240.)

143. Lowder and Hammond challenge K. Aldridge's fraud claim not just on Rule 9(b) grounds, but also based on their contention that the documents attached to the K. Aldridge Complaint regarding her investment in WSC Holdings (namely, the Subscription Agreement) defeat her allegations against them.

144. As an initial matter, the Subscription Agreement does not expressly contradict K. Aldridge's allegations. Lowder and Hammond argue that her Subscription Agreement shows that her investment in WSC Holdings was with Siskey Industries, not the MetLife Defendants or its employees. (*See* Ex. 16 to K. Aldridge Compl.) Regardless of whether her investment was with Siskey Industries or the MetLife Defendants, K. Aldridge alleges that Lowder and Hammond received commissions associated with this sale of securities. How those commissions were received (whether from the MetLife Defendants or from a separate company controlled by Siskey) is not determined by this attachment.

145. Moreover, the Court may not resolve fact disputes at this stage, including whether the fact that K. Aldridge's investment paperwork bears Siskey Industries' letterhead belies her allegations that Lowder and Hammond made representations to her about WSC Holdings. Likewise, the fact that the Subscription Agreement expressly states that K. Aldridge "has elected to make this investment based upon private negotiations with representatives of [WSC Holdings]" does not expressly contradict that she could have *also* had communications with Lowder and Hammond.

The Court is to accept K. Aldridge's allegations as pleaded and should only reject them when they are contradicted—not merely put in question—by attached documents. *See Moch v. A.M. Pappas & Assoc., LLC*, 251 N.C. App. 198, 206, 794 S.E.2d 898, 903 (2016). Accordingly, the Court declines to dismiss K. Aldridge's fraud claim on these grounds.

146. With regard to Rule 9(b), K. Aldridge has pleaded her fraud claim with sufficient particularity. As noted above, a plaintiff must allege the who, where, and when of the misrepresentation, as well as what was obtained as a result of the misrepresentation (i.e., the why). *See Deluca*, 2015 NCBC LEXIS 12, at *21. K. Aldridge meets these requirements: she alleges that in early April 2016 (when), Lowder and Hammond (who) at the Wall Street Capitol office (where) told her that the money she invested in WSC Holdings was a "guaranteed" safe asset-backed investment with a "fixed rate" of return (what), and that this was done so that she would invest her money into WSC Holdings and Lowder and Hammond would earn a commission (why). (K. Aldridge Compl. ¶ 166.) Accordingly, Lowder and Hammond's motion seeking dismissal of K. Aldridge's fraud claim against them premised on their affirmative misrepresentations regarding her investment in WSC Holdings is DENIED and this claim shall go forward. Because K. Aldridge has specifically alleged her fraud claim against Lowder and Hammond, her fraud claim brought against the MetLife Defendants on the basis of *respondeat superior* survives as well and the corresponding motion brought by the MetLife Defendants is DENIED on those grounds.

147. The Court similarly concludes that K. Aldridge's fraud claim against the MetLife Defendants premised on Siskey's misrepresentations survives dismissal. She has pleaded with particularity that Siskey falsely represented to her in April 2016 that her investment in WSC Holdings would be a "guaranteed" safe investment and reading the K. Aldridge Complaint in the light most favorable to her, this statement was made at the Wall Street Capitol office. Accordingly, K. Aldridge's fraud claim against the MetLife Defendants on a theory of vicarious liability survives on this basis as well, and the MetLife Defendants' motion is DENIED for this additional reason.

148. In sum, the Court concludes that K. Aldridge's fraud claim premised on Siskey's, Lowder's, and Hammond's affirmative misrepresentations regarding her investment in WSC Holdings—and vicarious liability extending to the MetLife Defendants on that basis—survives dismissal at this time. The Motions are therefore DENIED on those grounds.

        *c.*     *Goulet*

149. Goulet's fraud claim is directed to Siskey's and Hammond's alleged conduct related to inducing Goulet to invest in TSI Holdings. (Goulet Compl. ¶ 133.) Reading the Complaint in the light most favorable to Goulet, he also appears to base his fraud claim against the MetLife Defendants on the basis of *respondeat superior* for both Siskey's and Hammond's conduct. (Goulet Compl. ¶¶ 133, 208.)

150. However, under Goulet's fraud claim heading, he appears to base his claim only on Hammond's omissions and not on any affirmative misrepresentation. (*See*

Goulet Compl. ¶ 133.) Nonetheless, reading the Goulet Complaint as a whole, the Court notes that Goulet does allege that Hammond misrepresented information about investments with Wall Street Capitol. Specifically, Goulet alleges that in March 2015, he met with Siskey at the Wall Street Capitol office and that Hammond and Siskey represented to him that he could invest with Wall Street Capitol and receive a "guaranteed" rate of return with "no risk[.]" (Goulet Compl. ¶ 118.) Goulet then alleges that "based on these representations[,]" he invested in TSI Holdings on April 8, 2015. (Goulet Compl. ¶ 120.) As alleged, it is unclear to the Court whether Hammond was present at the March 2015 meeting with Siskey and/or whether his statement regarding Wall Street Capitol investments was said to induce Goulet to specifically invest in TSI Holdings on April 8, 2015. Accordingly, the Court does not believe that this allegation has been pleaded with enough particularity to support Goulet's fraud claim. Beyond this single allegation, Goulet repetitively mentions affirmative misrepresentations by Siskey and not Hammond. (*See* Goulet Compl. ¶¶ 120, 133, 134.) Accordingly, the Court concludes that Goulet's fraud claim against Hammond based on any affirmative misrepresentations should be DISMISSED and Hammond's motion should be GRANTED on this narrow basis.

151. Goulet, therefore, cannot seek to impose vicarious liability on the MetLife Defendants for Hammond's affirmative misrepresentations. Goulet also, however, alleges that Siskey made certain misrepresentations that induced him to invest in TSI Holdings. Many of the allegations against Siskey also fail to meet the Rule 9(b) requirement. However, Goulet alleges that on April 8, 2015, at the Wall Street

Capitol office, he was induced to invest in TSI Holdings based on a misrepresentation from Siskey that he was "guaranteed" a 3.9 percent rate of return on his investment so long as he kept the funds invested for one year, and that his funds would be available at any time. (Goulet Compl. ¶ 120.) Goulet's allegations in this regard are pleaded with sufficient particularity. Accordingly, the MetLife Defendants' motion to dismiss Goulet's fraud claim is DENIED on this basis.

152. In sum, the Court concludes that Goulet's fraud claim to the extent (if at all) premised on Hammond's affirmative misrepresentations regarding his investment in TSI Holdings is insufficient to state a claim. Because Goulet has not sufficiently alleged his fraud claim against Hammond in this regard, Goulet cannot impose vicarious liability upon the MetLife Defendants for that conduct. Accordingly, Hammond's motion to dismiss and the MetLife Defendants' motion to dismiss are both GRANTED on this narrow basis and Goulet's fraud claim based on Hammond's affirmative misrepresentations is DISMISSED as to both Hammond and the MetLife Defendants. However, Goulet may proceed upon his fraud claim seeking to hold the MetLife Defendants vicariously liable for Siskey's affirmative misrepresentations. The MetLife Defendants' motion is therefore DENIED in that regard.

d. *The Kelly Plaintiffs*

153. The Kelly Plaintiffs' fraud claim is directed to Siskey's and Phillips's, alleged conduct related to inducing the Kelly Plaintiffs to invest with Wall Street Capitol. (Kelly Compl. ¶ 248.) Reading the Complaint in the light most favorable to the Kelly Plaintiffs, they also appear to base their fraud claims against the MetLife

Defendants on the basis of *respondeat superior* for both Siskey's and Phillips' conduct. (Kelly Compl. ¶¶ 248, 323.)

154. However, under the Kelly Plaintiffs' fraud claim heading, they appear to base their claims only on Phillips's omissions and not on any affirmative misrepresentation. (*See* Kelly Compl. ¶ 248.) Nonetheless, reading the Kelly Complaint as a whole, the Court notes that the Kelly Plaintiffs do state several times that Phillips and Siskey "falsely represent[ed] to [them] orally and in writing that the [investment] funds were 'guaranteed.'" (Kelly Compl. ¶¶ 133, 135, 161, 187, 213, 238.) Even assuming these statements support the Kelly Plaintiffs' fraud claim, they have not been pleaded with particularity. The Court is unable to ascertain when these misrepresentations were made, how many times Phillips (as opposed to Siskey) made them, or to which investments they related. These statements, therefore, cannot support the Kelly Plaintiffs' fraud claims.

155. The Kelly Plaintiffs also allege that Phillips and Siskey sent them inaccurate statements indicating that their investments were worth substantially more than they were. (Kelly Compl. ¶¶ 125–26, 152–53, 178–79, 207–08, 236.) Each Kelly Plaintiff, other than H. Lemons, states which investment this fraudulent statement came from, when the statement was delivered, what was misrepresented, and that the statement came from their "MetLife/Wall Street Capitol offices[.]" For all Kelly Plaintiffs, other than H. Lemons, a copy of their allegedly false investment statements is attached to the Kelly Complaint. (*See* Exs. 18, 19, 22, 26 to Kelly

Compl.) These allegedly false investment statements have therefore been pleaded with sufficient particularity.

156. However, the question becomes whether these inaccurate statements support the Kelly Plaintiffs' fraud claim. The Court concludes that they cannot, as pleaded. As Phillips argues in his motion, the Kelly Plaintiffs' fraud claim is based on being induced to invest, and these investment statements came *after* the Kelly Plaintiffs had already invested. Accordingly, a fair reading of the Kelly Complaint does not put Phillips on notice that their fraud claims are premised on these false investment statements. As a result, the Court DISMISSES the Kelly Plaintiffs' fraud claims against Phillips to the extent they are based on these alleged investment statements. Likewise, the MetLife Defendants cannot be held vicariously liable on this basis.

157. The MetLife Defendants argue that the fraud claim asserted against it should also be dismissed because the Kelly Plaintiffs are only seeking to hold MetLife vicariously liable on this claim,[13] and since the Kelly Plaintiffs have failed to plead with particularity any misrepresentations by Siskey or Phillips, their fraud claim against the MetLife Defendants should also be dismissed. The Court agrees. As noted above, the misrepresentations alleged against Phillips to support the Kelly Plaintiffs' fraud claims are not pleaded with particularity. Likewise, statements by

---

[13] The Court notes that perhaps the Kelly Plaintiffs are seeking to hold MetLife directly liable for their "touting" Siskey as a trusted investment advisor. There are no facts to support that MetLife affirmatively communicated this to the Kelly Plaintiffs, or when that communication is alleged to have occurred. Therefore, this conclusory statement, on its own, cannot support a fraud claim seeking to hold MetLife directly liable.

Siskey "[i]n 2015 and 2016" that induced the Kelly Plaintiffs to invest in the Investment Ponzi Scheme are not particular enough. Accordingly, the Kelly Plaintiffs' fraud claim against the MetLife Defendants, seeking to hold them vicariously liable, is DISMISSED.

158. In sum, the Court concludes that the Kelly Plaintiffs' fraud claim to the extent (if at all) premised on Phillips's affirmative misrepresentations are insufficient to state a claim. Because the Kelly Plaintiffs have not sufficiently alleged with particularity their fraud claims against Phillips in this regard, they cannot impose vicarious liability upon the MetLife Defendants for that conduct. Likewise, the Kelly Plaintiffs' have failed to support their fraud claim against the MetLife Defendants on the basis of Siskey's affirmative misrepresentations. Accordingly, Phillips's motion to dismiss and the MetLife Defendants' motion to dismiss are both GRANTED to the extent the Kelly Plaintiffs' fraud claims are based on any affirmative misrepresentations by Phillips or Siskey and these claims are DISMISSED on this basis.

### e. Olin

159. Olin's fraud claim is directed to Siskey's, Lowder's, and Hammond's alleged conduct related to inducing Olin to invest in the Investment Ponzi Scheme and to buy life insurance. (Olin Compl. ¶ 166.) Reading the Complaint in the light most favorable to Olin, he also appears to base his fraud claim against the MetLife Defendants on the basis of *respondeat superior* for Siskey's, Lowder's, and Hammond's conduct. (Olin Compl. ¶¶ 166, 249.)

160. However, under Olin's fraud claim heading, he appears to base his claim only on Lowder's and Hammond's omissions and not on any affirmative misrepresentation by these defendants. (*See* Olin Compl. ¶ 166.) Nonetheless, reading the Olin Complaint as a whole, the Court notes that Olin does make several general statements about Siskey's, Lowder's, and Hammond's alleged misrepresentations, including that Siskey represented investments with Wall Street Capitol were "guaranteed" with a "fixed rate" of return and "better than going to a bank[,]" (Olin Compl. ¶ 121), that from 2000 through 2016, Siskey "and other MetLife employees" prepared and delivered false periodic written statements indicating that his investments were safe and maturing, (Olin Compl. ¶ 127), that also from 2000 through 2016, Lowder and Hammond met with Siskey and Olin "regularly" and were present when Siskey made misrepresentations to Olin, (Olin Compl. ¶ 146), and that based on "further false representations" of Siskey, Lowder, and Hammond, Olin invested in Siskey Capitol, (Olin Compl. ¶ 136). Even if these allegations were to support Olin's fraud claim, none are pleaded with particularity, and therefore Olin's fraud claim cannot survive dismissal on these statements.

161. Lowder and Hammond make a separate argument that their insurance dealings with Olin bear no connection to Olin's fraud claim. The Court agrees. Olin in no way ties Lowder and Hammond's insurance sales to the Insurance Ponzi Scheme, nor does Olin allege that Lowder and Hammond misrepresented anything about the insurance they sold to him. Therefore, Lowder and Hammond's insurance dealings with Olin do not appear to, and cannot, form the basis for Olin's fraud

claim.[14]  Because no affirmative statement by Lowder and Hammond can support Olin's fraud claim, it is DISMISSED on these grounds.  Because Olin has failed to support his fraud claim based on any affirmative misrepresentation by Lowder or Hammond, Olin's fraud claim seeking to hold the MetLife Defendants vicariously liable on this basis must also be DISMISSED.

162.  However, the Court concludes that Olin has alleged with particularity elsewhere in his complaint that Siskey fraudulently misrepresented information about TSI Holdings to induce Olin to invest in that entity.  Olin alleges that in October 2010,[15] at the Wall Street Capitol office, Siskey advised him to invest his sale proceeds from the asset sale of his investment in Carolina Beer into TSI Holdings, promising Olin that he would earn a "guaranteed 5% rate of return" on the investment.  (Olin Compl. ¶ 132.)  This statement supports Olin's fraud claim seeking to hold the MetLife Defendants vicariously liable for Siskey's misrepresentations.  Accordingly, the MetLife Defendants' motion is DENIED on that basis.

163.  In sum, the Court concludes that Olin's fraud claim to the extent (if at all) premised on Lowder's or Hammond's affirmative misrepresentations is insufficient to state a claim.  Because Olin has not sufficiently alleged his fraud claim against Lowder or Hammond in this regard, he cannot impose vicarious liability upon the MetLife Defendants for that conduct.  Accordingly, Lowder and Hammond's motion

---

[14] They can, however, support Olin's position that Lowder and Hammond owed duties to him, as discussed below.

[15] In paragraph 167, Olin represents this date as August 8, 2010, but that is the date that Olin received his profits from his Carolina Beer investment, not when he was allegedly advised to invest those proceeds in TSI, which allegedly occurred in October.  (*See* Olin Compl. ¶¶ 131–32.)

to dismiss and the MetLife Defendants' motion to dismiss are both GRANTED on this narrow basis and Olin's fraud claim based on Lowder's and Hammond's affirmative misrepresentations is DISMISSED. However, Olin may proceed upon his fraud claim seeking to hold the MetLife Defendants vicariously liable for Siskey's affirmative misrepresentations regarding TSI Holdings. The MetLife Defendants' motion is therefore DENIED in that regard.

### f. Peterson

164. Peterson's fraud claim is directed to Siskey's and Hammond's alleged conduct related to inducing Peterson to invest in Siskey Capitol Opportunity Fund, SRP, LBI, and Kure. (Peterson Compl. ¶ 133.) Reading the Complaint in the light most favorable to Peterson, he also appears to base his fraud claim against the MetLife Defendants on the basis of *respondeat superior* for both Siskey's and Hammond's conduct. (Peterson Compl. ¶¶ 133, 208.)

165. However, under Peterson's fraud claim heading, he appears to base his claim only on Hammond's omissions and not on any affirmative misrepresentation. (*See* Peterson Compl. ¶ 133.) Nonetheless, reading the Peterson Complaint as a whole, the Court notes that Peterson does allege that Hammond misrepresented information about investments with Wall Street Capitol. Specifically, Peterson alleges that on December 12, 2014, he met with Hammond and was induced to invest in Siskey Capitol Opportunity Fund II. (Peterson Compl. ¶ 118.) However, Peterson does not state how Hammond induced him, let alone if it was based on any specific misrepresentation. Peterson also alleges that with respect to his investments in LBI

and Kure, Siskey made "numerous misrepresentations[.]" (Peterson Compl. ¶ 121.) These allegations are deficient in meeting the Rule 9(b) standard. Similarly, with respect to Peterson's investment in SRP, Peterson alleges that *Siskey*, not Hammond, sent him a written misrepresentation about the building in which SRP owned a 1/3 interest. (Peterson Compl. ¶ 123.) Accordingly, to the extent (if at all) Peterson bases his fraud claim on any affirmative misrepresentation by Hammond, the Court DISMISSES his fraud claim on that basis.

166. Peterson, therefore, cannot seek to impose vicarious liability on the MetLife Defendants for Hammond's alleged affirmative misrepresentations. Peterson also, however, alleges that Siskey made certain misrepresentations that induced Peterson to invest with Wall Street Capitol. While Peterson alleges that Siskey claimed investments in WSC Holdings were "zero risk" asset-backed investments with a fixed rate of return at some point over a two-year period, this allegation is not pleaded with particularity. In contrast, Peterson's allegations regarding Siskey's misrepresentations concerning SRP are pleaded with particularity. (*See* Peterson Compl. ¶¶ 123–24.) Peterson alleges that Siskey falsely represented the debt-to-equity ratio of the building that SRP held an interest in, and that these misrepresentations induced Peterson to invest in SRP on April 21, 2016. (Peterson Compl. ¶¶ 122–24.) For purposes of Rule 12(b)(6) and Rule 9(b), this is sufficient to withstand dismissal at this time.[16] Accordingly, Peterson's fraud claim against the

---

[16] Defendants argue that any plaintiff who relies upon misrepresentations regarding SRP is collaterally estopped because the Trustee determined the SRP bank account was not utilized by Siskey in the Investment Ponzi Scheme. However, there is nothing in Plaintiffs' complaints that could support a ruling that any claim was barred by collateral estoppel and

MetLife Defendants, premised on Siskey's misrepresentations regarding SRP, survives dismissal and the MetLife Defendants' motion is DENIED on this basis.

167. In sum, the Court concludes that Peterson's fraud claim to the extent (if at all) premised on Hammond's affirmative misrepresentations is insufficient to state a claim. Because Peterson has not sufficiently alleged with particularity his fraud claim against Hammond in this regard, he cannot impose vicarious liability upon the MetLife Defendants for that conduct. Accordingly, Hammond's motion to dismiss and the MetLife Defendants' motion to dismiss are both GRANTED on this narrow basis and Peterson's fraud claim based on Hammond's affirmative misrepresentations is DISMISSED in that regard. However, Peterson may proceed upon his fraud claim seeking to hold the MetLife Defendants vicariously liable for Siskey's affirmative misrepresentations regarding Peterson's investment in SRP. The MetLife Defendants' motion is therefore DENIED in that regard.

g. *The Williamses*

168. The Williamses' fraud claim is directed to Siskey's and Phillips's alleged conduct related to inducing the Williamses to invest with Wall Street Capitol. (Williams Compl. ¶ 149.) Reading the Complaint in the light most favorable to the Williamses, they also appear to base their fraud claims against the MetLife

---

Defendants have not even argued in their briefing that all elements for collateral estoppel have been met. Accordingly, Defendants do not make a "colorable assertion that [any] claim is barred under the doctrine of collateral estoppel[,]" *Fox v. City of Greensboro*, 2013 N.C. App. LEXIS 1321, at *10–11 (N.C. Ct. App. Dec. 17, 2013), and thus the Court considers the allegations concerning SRP just as it does Plaintiffs' other investments.

Defendants on the basis of *respondeat superior* for both Siskey's and Phillips's conduct. (Kelly Compl. ¶¶ 149, 222.)

169. However, under the Williamses' fraud claim heading, they appear to base their claim only on Phillips's omissions and not on any affirmative misrepresentation by him. (*See* Williams Compl. ¶ 149.) Nonetheless, reading the Williams Complaint as a whole, the Court notes that the Williamses allege that Siskey and Phillips misrepresented information surrounding the Williamses' investment in SRP, namely that Siskey and Phillips "made numerous misrepresentations . . . about the suitability of [SRP], including . . . a written misrepresentation that the Wall Street Capitol building carried a debt of 5 million dollars . . .[,]" and that the Williamses' investment in SRP would achieve "[l]iquidity within 6 months (guaranteed by Rick Siskey and Sharon Road Properties)[.]" (Williams Compl. ¶¶ 118, 135.) A written misrepresentation, alleged to have been sent by both Siskey and Phillips, is attached as Exhibit 15 to the Williams Complaint. Although the document attached as Exhibit 15 is undated and does not indicate who it was sent by, a liberal reading of the Williams Complaint indicates that this handout was prepared by both Phillips and Siskey and provided to the Williamses, which induced them to invest in SRP. On a Rule 12(b)(6) motion and consistent with Rule 9(b), this misrepresentation has been pleaded with sufficient particularity. Accordingly, the Williamses' fraud claim may proceed based on this affirmative misrepresentation by Phillips and by Siskey. It follows therefrom that the Williamses' fraud claim against the MetLife Defendants

premised on a theory of vicarious liability may also proceed. Phillips's motion and the MetLife Defendants' motion are therefore DENIED in this regard.

170. In sum, the Court concludes that the Williamses' fraud claim to the extent premised on Phillips's and Siskey's affirmative misrepresentations regarding the Williamses' investment in SRP are pleaded with sufficient particularity and may proceed. The corresponding motions are therefore DENIED to the extent they seek dismissal of the Williamses fraud claim based on affirmative misrepresentations.

### 2. Rule 9(b) Analysis – Fraud by Omissions and Concealment

171. As noted above, Plaintiffs' fraud claims against Defendants are premised primarily on Defendants' omissions and concealment of material facts regarding the Investment Ponzi Scheme. (J. Aldridge Compl. ¶¶ 177, 182; K. Aldridge Compl. ¶¶ 165, 169; Goulet Compl. ¶¶ 133, 138; Kelly Compl. ¶¶ 248, 254; Olin Compl. ¶¶ 166, 170; Peterson Compl. ¶¶ 133, 138; Williams Compl. ¶¶ 149, 154.) Specifically, Plaintiffs allege that Defendants knew of Siskey's disciplinary past, including his violations of law, fines, and suspensions, and failed to relay that information to—and even actively concealed that information from—Plaintiffs.

172. Where a fraud claim arises by concealment or nondisclosure of material facts, a plaintiff must allege that the defendant(s) "had a duty to disclose material information to [the plaintiff], as silence is fraudulent only when there is a duty to speak." *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *8 (N.C. Super. Ct. June 18, 2007) (citing *Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976)). This Court has acknowledged that "fraud by omission is, by

its very nature, difficult to plead with particularity." *Id.* at *9 (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997)). In so recognizing, our Court adopted the factors considered by the *Breeden* court on fraud by omission claims. *Id.* at *10. Accordingly, a plaintiff must allege:

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Id.* at *10 (citing *Breeden*, 171 F.R.D. at 195); *see also Global Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 159, at *26 (N.C. Super Ct. Nov. 29, 2018); *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at *21–22 (N.C. Super. Ct. Feb. 9, 2018); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC LEXIS 64, at *13–14 (N.C. Super. Ct. June 19, 2015); *Allran v. Branch Banking & Trust Corp.*, 2011 NCBC LEXIS 20, at *10–11 (N.C. Super. Ct. July 6, 2011).

173. A duty to disclose arises in three situations:

> (1) there is a fiduciary relationship between the parties to the transaction; (2) "a party has taken affirmative steps to conceal material facts from the other;" or (3) "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence."

*Christenbury Eye Ctr.*, 2015 NCBC LEXIS 64, at *14 (quoting *Harton v. Harton*, 81 N.C. App. 295, 297–98, 344 S.E.2d 117, 119 (1986)). However, even absent a duty to speak, it is well-established that once a party *chooses to speak*, that party then "has

a duty to make a full and fair disclosure of facts concerning the matters on which he chooses to speak." *Ragsdale v. Kennedy*, 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974).

174. Defendants contend that Plaintiffs have failed to plead their fraud by omission claims with particularity because Plaintiffs have failed to allege that Defendants had any duty to disclose Siskey's past disciplinary actions to Plaintiffs. The Court first addresses whether such a duty extends to the Individual Defendants, and then, whether one extends to the MetLife Defendants.

> a. *Individual Defendants*

175. The Individual Defendants argue that Plaintiffs have failed to plead any facts to establish that they had a legal duty to disclose Siskey's disciplinary history. In support, they argue that federal law requires investment advisors to disclose certain legal or disciplinary information to the client *as against himself or herself*. This law—the Investment Advisors Act—does not, however, impose any similar duty to disclose information about another investment advisor. Furthermore, for those Plaintiffs that allege the Individual Defendants should have disclosed this information about Siskey on Plaintiffs' account statements, the Individual Defendants argue it is neither required nor customary for such information about any agent to appear on these statements.

176. As an initial note, the Court does not believe it proper to consider on a Rule 12(b)(6) motion what was "customary" or "industry practice" to include on financial account statements because that analysis goes beyond the four corners of the

Complaints. Moreover, regardless of what the Investment Advisors Act may or may not require of SEC-registered investors, consistent with *Harton*, the Individual Defendants would owe a duty to Plaintiffs if Plaintiffs' allegations fall into one or more of the three scenarios identified above. Having concluded in Section VI.C, *supra*, that Plaintiffs have failed to plead the existence of a fiduciary relationship between them and the applicable Individual Defendants, the Court considers the second and third situation, both in arm's length's transactions, that could impose a duty to disclose on the Individual Defendants. Plaintiffs allege in a conclusory fashion that the Individual Defendants "concealed" material facts regarding the Investment Ponzi Scheme and Siskey's disciplinary history. (J. Aldridge Compl. ¶ 177; K. Aldridge Compl. ¶ 165; Goulet Compl. ¶ 133; Kelly Compl. ¶ 248; Olin Compl. ¶ 166; Peterson Compl. ¶ 133; Williams Compl. ¶ 149.) Plaintiffs have failed to plead how or when the Individual Defendants attempted to conceal this information, or any other information that could support a theory to that effect. Therefore, a duty to disclose does not extend on that basis.

177. The Court also concludes that information regarding Siskey's disciplinary history does not go to the "subject matter of the negotiations" regarding Plaintiffs' investments. Rather, it goes to background information on a potential investment advisor. Accordingly, the Court concludes that a duty to disclose does not extend on that basis either.

178. Nonetheless, our Supreme Court has held that even where there is "no duty to speak under the circumstances, . . . if [the defendant] does assume to speak he

must make a full and fair disclosure of the matters he discusses." *Ragsdale*, 286 N.C. at 139, 209 S.E.2d at 501. In *Ragsdale*, the president and manager of a company induced stockholders to purchase 12,500 shares of common stock based on statements that the company was a "gold mine" and a "going concern[.]" *Id.* at 137−38, 209 S.E.2d at 500. The president failed to disclose other facts concerning the corporation's liquidity and indebtedness. The Court held that when the president undertook to describe the business in such a positive light, "he incurred a concomitant duty to make a full disclosure of any extenuating financial circumstances which counteracted his positive assertions concerning the condition of the corporation." *Id.* at 139, 209 S.E.2d at 501.

179. Goulet and Peterson have alleged that Hammond advised Goulet and Peterson to meet with Siskey, and in so doing, did not provide them with all the facts about Siskey's qualifications as an investment advisor. (Goulet Compl. ¶¶ 113, 119; Peterson Compl. ¶ 121.) Reading the allegations in the light most favorable to these two Plaintiffs, they allege that Hammond recommended Siskey as someone with whom Plaintiffs should seek investment advice. These facts are minimally sufficient to impose a duty on Hammond to make "a full and fair disclosure" when recommending Siskey as an investment advisor. *Ragsdale*, 286 N.C. at 139, 209 S.E.2d at 501. Accordingly, Hammond's motion is DENIED with respect to Goulet and Peterson's fraud claim premised on Hammond's omissions. These claims, therefore, survive dismissal at this time.

180. However, for J. Aldridge, K. Aldridge, the Kelly Plaintiffs, Olin, and the Williamses, there are no allegations that Plaintiffs were recommended, or otherwise advised, by the Individual Defendants to consult with Siskey about their investments. Rather, from their respective complaints, the Court is unable to determine how these Plaintiffs began working with Siskey and whether the Individual Defendants induced them, through positive affirmations or otherwise, to begin working with Siskey. Moreover, there are no allegations in these Complaints that the Individual Defendants made any representations about Siskey's trustworthiness.[17] Accordingly, and different from the Court's conclusion regarding Goulet and Peterson, the Court believes that *Ragsdale* does not support imposing a duty on the Individual Defendants to disclose Siskey's past with respect to the fraud claims brought by J. Aldridge, K. Aldridge, the Kelly Plaintiffs, Olin, and the Williamses.

181. Based on the foregoing, Plaintiffs' claims for fraud by omission against the Individual Defendants in the J. Aldridge Complaint, K. Aldridge Complaint, Kelly Complaint, Olin Complaint, and Williams Complaint are DISMISSED. Plaintiffs' claims for fraud by omission against the Individual Defendants in the Goulet Complaint and Peterson Complaint, however, survive, and in that regard the Individual Defendants' motions are DENIED.

---

[17] There are, however, several allegations that the MetLife Defendants touted the Individual Defendants and Siskey as trustworthy, and that the Individual Defendants indicated their own personal trustworthiness. (J. Aldridge Compl. ¶¶ 119, 122; K. Aldridge ¶¶ 121, 123; Kelly Compl. ¶¶ 154, 285; Olin Compl. ¶¶ 171, 214; Williams Compl. ¶¶ 155, 186.)

b.	*The MetLife Defendants*

182. Based on the Court's earlier ruling in the Rule 12(b)(1) Order and Opinion, K. Aldridge, the Lemonses, and V. Williams lack standing to bring their fraud by omission claims against the MetLife Defendants. *See Aldridge*, 2019 NCBC LEXIS 53, at *73. Therefore, the MetLife Defendants' motions as to these plaintiffs are DENIED AS MOOT.

183. The remaining Plaintiffs (J. Aldridge, Goulet, Kelly, Leite, Reittinger, Olin, Peterson, and J. Williams) have sufficiently alleged that the MetLife Defendants had a duty to speak. Plaintiffs have alleged that the MetLife Defendants knew of Siskey's past disciplinary history, and in fact travelled to Charlotte to investigate more about Siskey and his dealings through Wall Street Capitol, but that, despite knowledge of Siskey's improper professional behavior, they chose not to tell Plaintiffs and MetLife's other customers any information about Siskey's past. Instead, they "implemented a plan to [attempt to] shield themselves from liability[.]" (J. Aldridge Compl. ¶ 173; K. Aldridge Compl. ¶ 161; Goulet Compl. ¶ 129; Kelly Compl. ¶ 137; Olin Compl. ¶ 156; Peterson Compl. ¶ 129; Williams Compl. ¶ 124.) The Court believes this is minimally sufficient, at this time, to allege the existence of a duty upon the MetLife Defendants to support Plaintiffs' fraud by omission claims against the MetLife Defendants.[18]

184. Accordingly, at this time, the Court declines to dismiss Plaintiffs' fraud claims premised on the MetLife Defendants' failure to disclose Siskey's violations of

---

[18] Plaintiffs do not identify with any specificity whether they seek to hold the MetLife Defendants liable for any omissions and concealment of material facts by Siskey, and therefore the Court does not evaluate Plaintiffs' claims on that basis.

law, fines, and suspensions. The MetLife Motions as to J. Aldridge, Goulet, Kelly, Leite, Reittinger, Olin, Peterson, and J. Williams, therefore, are DENIED in this respect.

### 3. Reasonable Reliance

185. Defendants also seek to dismiss Plaintiffs' various fraud claims based on their failure to plead reasonable reliance. Reliance "is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Cobb v. Pa. Life. Ins. Co.*, 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011). At the same time, "the reasonableness of a party's reliance is a question of fact[,]" and "unless the facts are so clear that they support only one conclusion[,]" a plaintiff's claim premised on misrepresentations or omissions should not be dismissed at the Rule 12(b)(6) stage. *Tillery Envtl. LLC*, 2018 NCBC LEXIS 13, at *54 (quoting *Forbis*, 361 N.C. at 527, 649 S.E.2d at 387).

186. Defendants contend that Plaintiffs could have discovered the truth through publicly available information, specifically the public notices of Siskey's disciplinary actions attached as exhibits to the Complaints. The public notices attached to each complaint are identical. (*See, e.g.*, Exs. 11 & 12 to J. Aldridge Compl.)

187. First, the public notice regarding Siskey's NASD disciplinary action is undated and does not clearly indicate where it could be found (whether it was available in print only or online, for example). Furthermore, Siskey's fine and suspension appears on the back page of this document, in small script, in between two other disciplinary actions. Second, Siskey's DOL disciplinary action has a date

stamp of March 23, 2018. Accordingly, it is not clear from the record whether this document would have been readily available to Plaintiffs back in 2011 or any time thereafter through Siskey's death in 2016. Therefore, the Court concludes that Plaintiffs' attachments of these two exhibits to their respective complaints does not make it "so clear that they support only one conclusion." Although these exhibits are, in fact, notices that *could* have been available to Plaintiffs at the time they were brought against Siskey or around the time of Plaintiffs' investments, it is not proper, on a Rule 12(b)(6) motion, for the Court to make a factual determination whether or not such notices were available then, or to determine Plaintiffs' reasonableness (or lack thereof) in not discovering the notices at that time. Accordingly, the Motions are therefore DENIED on this basis.

E. **Negligent Misrepresentation (against all Defendants)**

188. In the alternative to their fraud claims, Plaintiffs plead that Defendants were negligent when providing information to Plaintiffs about their investments and/or insurance contracts and made negligent misrepresentations regarding the same. (J. Aldridge Compl. ¶¶ 212–13; K. Aldridge Compl. ¶¶ 199–200; Goulet Compl. ¶¶ 167–68; Kelly Compl. ¶¶ 282–83; Olin Compl. ¶¶ 211–12; Peterson Compl. ¶¶ 167–68; Williams Compl. ¶¶ 183–84.) Under well-settled North Carolina law, a breach of duty giving rise to a claim for negligent misrepresentation has been defined as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused

to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 534, 537 S.E.2d 237, 241 (2000).

189. Unlike a fraud claim, a claim for negligent misrepresentation can only be based on affirmative misrepresentations, not on omissions. *See Harrold v. Dowd*, 149 N.C. App. 777, 783, 561 S.E.2d 914, 919 (2002); *Loftin v. QA Invs. LLC*, 2015 NCBC LEXIS 44, at *27 (N.C. Super. Ct. Apr. 30, 2015).

190. However, like Plaintiffs' fraud claims, their negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b). *Deluca*, 2015 NCBC LEXIS 12, at *20. Rule 9(b) provides that "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." N.C.G.S. § 1A-1, Rule 9(b).

191. The Court, therefore, relies upon its analysis set forth above regarding Plaintiffs' fraud claims, concluding again here that Plaintiffs have failed to plead many of their negligent misrepresentation claims with particularity. For the same reasons articulated in VI.D.1, Goulet, Olin, and Peterson have failed to allege any affirmative misrepresentation by the Individual Defendants to support their negligent misrepresentation claims against the Individual Defendants, and therefore the negligent misrepresentation claims brought by these plaintiffs against the Individual Defendants are DIMISSED. Similarly, having concluded above that Plaintiffs have failed to allege with sufficient particularity any affirmative

misrepresentation by the MetLife Defendants, Plaintiffs' negligent misrepresentation claims brought directly against the MetLife Defendants are also DISMISSED.

192. Consistent also with its conclusions above, the Court concludes that J. Aldridge's, K. Aldridge's, and the Williamses' negligent misrepresentation claims against the applicable Individual Defendants are stated with particularity. Additionally, and taking into consideration the allegations regarding Siskey's alleged misrepresentations, J. Aldridge's, K. Aldridge's, Goulet's, Olin's, Peterson's, and the Williamses' negligent misrepresentation claims against the MetLife Defendants on the basis of *respondeat superior* also survive.

193. The Court additionally notes that Plaintiffs' negligent misrepresentation claims, though brought in the alternative to their fraud claims, are wider in scope and encompass *all* conduct by the Individual Defendants at the Wall Street Capitol office, not just conduct that "induced" Plaintiffs to invest. (J. Aldridge Compl. ¶ 212; K. Aldridge Compl. ¶ 199; Goulet Compl. ¶ 167; Kelly Compl. ¶ 282; Olin Compl. ¶ 211; Peterson Compl. ¶ 167; Williams Compl. ¶ 183.) The effect of this language is significant to the Kelly Plaintiffs, whom otherwise would have no surviving negligent misrepresentation claim. Kelly, Leite, Reittinger, and D. Lemons have stated with particularity that Siskey and Phillips sent them fraudulent investment statements regarding their Wall Street Capitol investments. Accordingly, the Kelly Plaintiffs' negligent misrepresentation claim (to the extent it applies to misrepresentations made to Kelly, Leite, Reittinger, and D. Lemons) against the Individual Defendants,

and by extension to the MetLife Defendants on the basis of *respondeat superior*, satisfy the Rule 9(b) standard and shall not be dismissed on that basis.

194. Defendants also contend, however, that Plaintiffs' negligent misrepresentation claims fail because the Complaints are devoid of any factual allegations showing that Plaintiffs' investments benefitted Defendants and therefore these claims should fail because Defendants are not alleged to have had a pecuniary interest in the Investment Ponzi Scheme. The Court disagrees.

195. First, the Court need not address the MetLife Defendants' arguments in this regard, as the Court has already concluded in Section VI.D.1 above that Plaintiffs have not stated with particularity any affirmative misrepresentations by the MetLife Defendants, and therefore Plaintiffs' negligent misrepresentation claims against the MetLife Defendants only proceed on the basis of *respondeat superior*.

196. Second, as to Siskey and the Individual Defendants, Plaintiffs have alleged that these individuals received commissions for Plaintiffs' investments, and moreover, that Siskey and the Individual Defendants were acting within "the course of [their] business, profession or employment" at Wall Street Capitol when inducing Plaintiffs to invest with Wall Street Capitol and thereafter (in the case of the Kelly Plaintiffs) sending false investment statements to Plaintiffs. The Court concludes this is sufficient under Rule 12(b)(6) and Rule 9(b) to support the negligent misrepresentation claims asserted by J. Aldridge, K. Aldridge, Kelly, Leite, Reittinger, D. Lemons, and the Williamses. Therefore, these claims survive the Individual Defendants' motions to dismiss on this basis. Additionally, based upon

these surviving allegations of negligent misrepresentations against the Individual Defendants and including Siskey's negligent misrepresentations, all Plaintiffs (other than H. Lemons) may proceed with their negligent misrepresentation claims against the MetLife Defendants on the basis of *respondeat superior*.

## F. State Securities Fraud (against all Defendants)

197. Plaintiffs allege that Defendants have violated the North Carolina Securities Act, N.C.G.S. § 78A-56. (J. Aldridge Compl. ¶¶ 198–210; K. Aldridge Compl. ¶¶ 185–97; Goulet Compl. ¶¶ 153–65; Kelly Compl. ¶¶ 268–80; Olin Compl. ¶¶ 185–98; Peterson Compl. ¶¶ 153–65; Williams Compl. ¶¶ 169–81.) Article 7 of the NCSA provides for civil liability that may be "primary" or "secondary." N.C.G.S. § 78A-56(a)(1)–(2), (c). The relevant portions of the NCSA's primary liability provision state that:

> (a) Any person who:
>
> (1) Offers or sells a security in violation of [section] 78A-8(1), 78A-8(3) [provisions relating to fraud or deceit], . . . , or
>
> (2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission
>
> is liable to the person purchasing the security from him[.]

N.C.G.S. § 78A-56(a).

198. The portion of the NCSA that creates secondary liability is subdivided into two different types: (1) those who "control" a person found liable under section 78A-

56(a) or (b) (commonly referred to as "control person" liability), and (2) those who "materially aid[ ] in the transaction giving rise to the liability." N.C.G.S. § 78A-56(c)(1). Specifically, section 78A-56(c)(1) provides:

> (c)(1) Every person who directly or indirectly controls a person liable under subsection (a) . . . of this section, every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the sale is also liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

*Id.*

199. Where an NCSA claim is based on fraud, the claim must be stated with particularity. *Tillery Envt'l LLC*, 2018 NCBC LEXIS 13, at *20.

200. Plaintiffs seek to impose primary liability upon the Individual Defendants pursuant to section 78A-56(a)(2) and seek to impose secondary liability upon the MetLife Defendants.[19]

---

[19] Based on the Court's reading of the Complaints, Plaintiffs do not seek to impose primary liability on the MetLife Defendants for violation of section 78A-56(a)(2). In their Complaints, Plaintiffs only characterize the MetLife Defendants' liability based on their "direct control" over their employees, (J. Aldridge Compl. ¶ 206; K. Aldridge Compl. ¶ 193; Goulet Compl. ¶ 161; Kelly Compl. ¶ 276; Olin Compl. ¶ 193; Peterson Compl. ¶ 161; Williams Compl. ¶ 177), and their role in "materially aid[ing]" the Individual Defendants in violating section 78A-56(a)(2), (J. Aldridge Compl. ¶ 208; K. Aldridge Compl. ¶ 195; Goulet Compl. ¶ 163; Kelly Compl. ¶ 278; Olin Compl. ¶ 196; Peterson Compl. ¶ 163; Williams Compl. ¶ 179). The allegations specifically set forth in Plaintiffs' NCSA claims, and each Plaintiff's allegations taken as a whole, seek to impose liability on the MetLife Defendants pursuant to section 78A-56(c)(1), and not section 78A-56(a)(2). To the extent that Plaintiffs contend that they have asserted a claim against the MetLife Defendants for violation of section 78A-56(a)(2), Plaintiffs have failed to sufficiently allege any factual allegations that comply with Rule 9(b) to support such a claim.

### 1.    Primary Liability (against Individual Defendants)

201.    Section 78A-56(a)(2) imposes liability on a seller who makes a false or misleading statement about a material fact or makes a statement about a material fact that was false or misleading under the circumstances because of an omission. *Tillery Envt'l LLC*, 2018 NCBC LEXIS 13, at *63.   Liability under section 78A-56(a)(2) is restricted to "one who sells or offers for sale a security." *Bucci v. Burns*, 2018 NCBC LEXIS 37, at *20 (N.C. Super. Ct. Apr. 25, 2018).   An "'offer to sell' includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." N.C.G.S. § 78A-2(8)(b).

202.    Of particular importance here is that the NCSA does not impose a duty to disclose. *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *36–37 (N.C. Super. Ct. Feb. 19, 2013).   Rather, "[l]iability must be tied to a statement which was untrue or which was made misleading by omissions." *Id.*   Accordingly, only where a seller elects to make a statement regarding a security does the NCSA require that the statement contain sufficient material information to not be misleading.

203.    The Individual Defendants argue that Plaintiffs have failed to plead with particularity that the Individual Defendants made any misrepresentation regarding a sale of a security.   Consistent with the Court's fraud analysis in Section VI.D.1, J. Aldridge has alleged with particularity that Lowder made a misrepresentation in connection with the sale of a security (regarding an investment in SPP).   (J. Aldridge Compl. ¶¶ 134–35.)   Similarly, K. Aldridge has alleged with particularity that Lowder and Hammond made a misrepresentation regarding an investment in WSC Holdings.

(K. Aldridge Compl. ¶ 166.) The Williamses have also alleged with particularity that Phillips made a misrepresentation regarding the suitability of an investment in SRP. (Williams Compl. ¶¶ 118, 135.) Accordingly, for the purposes of this Rule 12(b)(6) and Rule 9(b) analysis, these four plaintiffs have sufficiently alleged a primary violation of the NCSA against the applicable Individual Defendants. The other plaintiffs—Goulet, the Kelly Plaintiffs, Olin, and Peterson—for the same reasons considered by the Court in Section VI.D. above—have failed to sufficiently allege their NCSA claims against the Individual Defendants, and accordingly, these claims are DISMISSED.

### 2. Control Person Liability (against the MetLife Defendants)

204. For Plaintiffs to bring a claim for secondary ("control person") liability under section 78A-56(c)(1), they must first plead a primary violation under section 78A-56(a)–(b1). *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at \*41; *see also Piazza v. Kirkbridge*, 246 N.C. App. 576, 597, 785 S.E.2d 696, 709 (2015). Plaintiffs have not asserted a claim against Siskey or his estate for primary violation of the NCSA; accordingly, Plaintiffs cannot maintain a claim against the MetLife Defendants for secondary liability on the basis of Siskey's alleged misrepresentations. *See Tillery Envt'l LLC*, 2018 NCBC LEXIS 13, at \*23 ("Without a claim for primary liability against [the control person], [plaintiff] cannot hold the individuals who are alleged to have controlled [the control person] secondarily liable . . . .").[20]

---

[20] While a principal may be held vicariously liable for the actions of its agent without that agent being a named defendant, as set forth in Section VI.B. above, the same is not true for NCSA claims based on the plain language of the statute and based on this Court's interpretation of control person liability under the NCSA.

205.    The MetLife Defendants challenge Plaintiffs' NCSA claims based on control theory liability for the same reason they challenge Plaintiffs' fraud claims: failure to adhere to the heightened pleading standard of Rule 9(b).  They argue that because Plaintiffs have failed to plead any misrepresentation by the Individual Defendants with particularity, liability cannot extend to the MetLife Defendants pursuant to section 78A-56(c)(1).  As to Goulet, the Kelly Plaintiffs, Olin, and Peterson, the Court agrees, as discussed above.  However, having concluded that J. Aldridge, K. Aldridge, and the Williamses have sufficiently pled a primary violation against the applicable Individual Defendants, the Court declines to dismiss these plaintiffs' section 78A-56(c)(1) claims against the MetLife Defendants.

206.    The MetLife Defendants additionally argue that Plaintiffs do not allege facts supporting a contention that the MetLife Defendants had control over the Individual Defendants with regard to the specific transactions at issue.  This Court has noted that section 78A-56(c)(1) "does not provide a manner for determining who 'directly or indirectly controls' a primarily liable person."  *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at *68–69 (N.C. Super. Ct. Feb. 9, 2018) (internal quotation marks omitted).  In determining whether control person liability applies, "[t]his Court has previously looked to analogous federal control person liability statutes . . . when interpreting section 78A-56(c)."  *Id.* (internal quotation marks and citations omitted).  Federal courts invoke a two-part test to determine whether one is a "control person" over a primarily liable person: "first, the alleged control person must have 'exercised general control over the operations of the

wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability.'" *Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *30 (N.C. Super. Ct. Feb. 27, 2015) (quoting *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911–12 (7th Cir. 1994)).

207. The Court concludes that Plaintiffs have sufficiently alleged that the MetLife Defendants had "control" over the Individual Defendants to survive dismissal. Plaintiffs have repeatedly alleged that the Individual Defendants were MetLife employees, that the MetLife Defendants exercised direct control over their employees, and that the Individual Defendants offered and sold securities as a part of their employment with MetLife at the Wall Street Capitol office. Consistent with the Court's treatment of Plaintiffs' vicarious liability claim, the Court cannot conclude that the Complaints, read in the light most favorable to Plaintiffs, permit the conclusion that the MetLife Defendants did not have the power or ability to control securities transactions conducted at the Wall Street Capitol office.

208. Accordingly, the NCSA claims asserted by J. Aldridge, K. Aldridge, and the Williamses against the MetLife Defendants shall proceed on the basis of "control person" liability and the MetLife Defendants' corresponding motions are DENIED in that regard.[21]

---

[21] Although the issue was briefed by the parties, the Court does not read the Complaints to state a claim for "control person" liability against the Individual Defendants because (1) Siskey's estate has not been named as a defendant to the Actions and (2) there are no allegations that the Individual Defendants had any control whatsoever over Siskey.

### 3. Aiding and Abetting Securities Violations (against the MetLife Defendants)

209. Plaintiffs also seek to hold the MetLife Defendants liable under section 78A-56(a)(2) as aiders and abettors of the Individual Defendants' alleged securities violations. This Court has stated that "materially aid[ing]" a primary violator should "require allegations of conduct which rise to the level of having contributed substantial assistance to the act or conduct leading to primary liability under the NCSA[.]" *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *49. Plaintiffs have alleged that the MetLife Defendants knew information about the Investment Ponzi Scheme when they conducted an investigation in 2014—which plausibly occurred prior to J. Aldridge's September 11, 2014 investment in SPP, K. Aldridge's April 2016 investment in WSC Holdings, and the Williamses' May 2016 investment in SRP—and refused to notify MetLife customers about the fraud transpiring under the MetLife Defendants' imprimatur.

210. Plaintiffs do not allege, however, how the MetLife Defendants *assisted* the Individual Defendants in perpetrating the Investment Ponzi Scheme. Without alleging any affirmative act—let alone a "substantial" act—on behalf of the MetLife Defendants, and based upon the allegations set forth in these complaints, J. Aldridge, K. Aldridge, and the Williamses cannot sustain an aiding and abetting claim against those defendants under the NCSA. Plaintiffs' NCSA claims in this regard, therefore,

are DISMISSED.[22]  Accordingly, the MetLife Motions, seeking dismissal of Plaintiffs' NCSA claims premised on "aiding and abetting" the Individual Defendants, are GRANTED.

## G.   Olin's NCIAA Claims (against the MetLife Defendants, Lowder, & Hammond)

211.  In addition to his claims brought pursuant to the NCSA, Olin also alleges that the MetLife Defendants, Lowder, and Hammond violated the North Carolina Investment Advisors Act, N.C.G.S. § 78C-1, *et. seq.*  (Olin Compl. ¶¶ 199–209.)  The NCIAA, like the NCSA, provides for civil liability that may be "primary" or "secondary."  N.C.G.S. § 78C-38(a)–(b).  The primary liability provision states, in pertinent part:

(a) Any person who:

(1) Engages in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or . . .

(2) Receives, directly or indirectly, any consideration from another person for advice as to the value of securities or their purchase or sale, whether through the issuance of analyses, reports or otherwise and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person in violation of 78C-8(a)(1) or (2),

is liable to any person who is given such advice in such violation[.]

N.C.G.S. § 78C-38(a).

---

[22] Consistent with footnote 21 and reading the Complaints in the light most favorable to Plaintiffs, Plaintiffs do not attempt to hold the Individual Defendants liable under section 78A-56(a)(2) as aiders and abettors of Siskey's fraud.

212. The secondary liability provision states, in relevant part:

> (b)(1) Every person who directly or indirectly controls a person liable under subsection (a) of this section, including every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the conduct giving rise to the liability is liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

N.C.G.S. § 78C-38(b)(1).

213. When premised on fraud, NCIAA claims must meet the particularity requirement of Rule 9(b). *See Shareff v. Lakebound Fixed Return Fund*, LLC, 2013 NCBC LEXIS 14, at *12–13 (N.C. Super. Ct. Mar. 6, 2013).

214. Like with his NCSA claim, Olin does not seek to impose primary liability on the MetLife Defendants. Instead, he separately sets forth his NCIAA claim against the MetLife Defendants (Fifth Claim) and NCIAA claim against Lowder and Hammond (Sixth Claim). In his Sixth Claim, Olin seeks to hold the MetLife Defendants liable for MetLife's role in "directly or indirectly" controlling Siskey,[23] Lowder, and Hammond from 2000 through 2016. He alleges that because Lowder and Hammond are primarily liable under section 78C-38(a), the MetLife Defendants are also "jointly and severally liable with and to the same extent" as Lowder and

---

[23] Despite the inclusion of Siskey in this allegation, the Court does not read Olin's NCIAA claim to be based on Siskey's investment advice because (1) Olin does not plead that Siskey is primarily liable under section 78C-38(a), and (2) Siskey's estate has not been named as a defendant in this action. As stated in footnote 20, while a principal may be held vicariously liable for the actions of its agent without that agent being a named defendant, the same is not true for NCIAA claims based on the plain language of the statute and based on this Court's interpretation of control person liability under the NCSA, which mirrors the NCIAA language in relevant part.

Hammond. (Olin Compl. ¶ 207.) Therefore, Olin's Complaint seeks only to impose liability on the MetLife Defendants pursuant to section 78C-38(b)(1). To the extent that Olin contends his NCIAA claim against the MetLife Defendants was premised also on section 78C-38(a), he has failed to sufficiently allege any factual allegations to support such a claim.

215. As to Olin's NCIAA claim against Lowder and Hammond for primary liability pursuant to N.C.G.S. §§ 78C-8 and -38, Olin alleges that Lowder and Hammond "participated in the Wall Street Capitol Ponzi Scheme and made false statements and omitted material facts in assisting" Siskey to solicit Olin to invest in the Premier Fund and TSI Holdings. (Olin Compl. ¶ 201.) Olin also alleges that Lowder and Hammond "received consideration for their work," both from the MetLife Defendants and Siskey, "in the form of commissions and/or management fees[.]" (Olin Compl. ¶ 200.)

216. However, Olin's NCIAA claim against Lowder and Hammond fails for the same reason as his fraud and NCSA claims, i.e., his failure to allege with particularity any false or misleading statement made by Lowder and Hammond regarding any of Olin's investments. Lowder's and Hammond's relationship to Olin, as set forth in the Olin Complaint, was predicated primarily on the insurance contracts Lowder and Hammond procured for him. (*See* Olin Compl. ¶¶ 146–49.) Olin's allegations regarding Lowder's and Hammond's involvement in Olin's investment activities are that Lowder and Hammond were present when *Siskey* made false statements regarding Olin's investments. (Olin Compl. ¶¶ 132, 146.) Liability pursuant to

section 78C-38(a) does not arise on that basis. *Compare* N.C.G.S. § 78C-38(a) (providing a cause of action for a person's affirmative act related to rendering investment advice, *with id*. § 78C-38(b) (providing secondary liability for another person's affirmative act related to the rendering of investment advice only where "control" over the person rendering the advice is established). Olin does allege in one paragraph—out of the 255 numbered allegations in his Complaint—that:

> After [Olin] moved his investments to MetLife's Wall Street Capitol office, Rick Siskey, *with the direct assistance and participation of Defendants, Ben Lowder and Gary Hammond* continued making representations that investments with Wall Street Capitol were "guaranteed" with a "fixed rate" of return and that investing with Wall Street Capitol, an office of MetLife, was "better than going to a bank."

(Olin Compl. ¶ 122 (emphasis added).)

217. However, Olin does not elaborate on how Lowder and Hammond directly assisted Siskey in making these misrepresentations, if these statements were made with respect to any particular investment by Olin, or when such assistance was given. Therefore, this allegation is insufficient to satisfy the requirements of Rule 9(b).

218. Moreover, the generalized statement that Olin "received investment advice from MetLife employees and agents[,]" (Olin Compl. ¶ 119), does not alert the Court, or more importantly Lowder and Hammond, as to what investment advice, if any, had ever been given by Lowder and Hammond as MetLife employees. *See Shareff*, 2013 NCBC LEXIS 14, at \*13–14 (dismissing an NCIAA claim where the plaintiff failed to identify which defendant made which alleged misrepresentation). Therefore, this allegation is also insufficient to support Olin's NCIAA claim. Accordingly, Olin's NCIAA claim against Lowder and Hammond is DISMISSED.

219. Further, because Olin has failed to allege a claim of primary liability against Lowder and Hammond, Olin's NCIAA secondary liability claim against the MetLife Defendants likewise fails. *See* N.C.G.S. § 78C-38(b) (extending liability to control persons only where a person whom they control is found "*liable* under subsection (a) of this section[.]" (emphasis added)); *see also NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *41–42 (concluding that similar language in the NCSA only extends liability to "control persons" under that statute if the plaintiff can demonstrate primary liability).

220. Based on the foregoing, Olin's NCIAA claims against the MetLife Defendants (Count V) and Lowder and Hammond (Count VI) are DISMISSED and the Motions requesting such relief are GRANTED to that extent.

**H.** **Negligence (Negligent Supervision) (against the MetLife Defendants)**

221. Although Plaintiffs each assert a general negligence claim against the MetLife Defendants, Plaintiffs' counsel conceded at the hearing on the Motions that these claims are in fact negligent supervision claims. "North Carolina recognizes a cause of action for negligent supervision and retention as an independent tort based on the employer's liability to third parties." *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398 (1998). A claim for negligent supervision requires a plaintiff to allege:

> (1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or

constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision[;] . . . and (4) that the injury complained of resulted from the incompetency proved.

*Medlin*, 327 N.C. at 590–91, 398 S.E.2d at 462 (emphasis and quotation marks omitted) (omissions in original).

222. Thus, "[t]o support a claim of negligent retention and supervision against an employer, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 677, 748 S.E.2d 154, 160 (2013).

223. As an initial matter, the Court acknowledges that pursuant to the Rule 12(b)(1) Order and Opinion, Plaintiffs lack standing to assert claims for negligent supervision regarding investments in the Bankrupt Entities. *Aldridge*, 2019 NCBC LEXIS 53, at *75. As a result, K. Aldridge cannot maintain her negligent supervision claim because her only investment with Wall Street Capitol was in WSC Holdings. Likewise, the Lemonses' negligent supervision claims in the Kelly Complaint are based only on their investments in WSC Holdings. Last, V. Williams's only investment with Wall Street Capitol was in SRP—another Bankrupt Entity. Because these plaintiffs' negligent supervision claims fail for lack of standing, the MetLife Motions are DENIED AS MOOT.

224. The Court thus turns to the negligent supervision claims averred by J. Aldridge, Goulet, Kelly, Leite, Reittinger, Olin, Peterson, and J. Williams. They are nearly identical: each seeks to impose liability on the MetLife Defendants for

MetLife's failure to adequately train and supervise Siskey and the Individual Defendants—as well as MetLife underwriters and compliance officers—thereby allowing Siskey and the Individual Defendants to perpetuate the Ponzi Schemes. (*See* J. Aldridge Compl. ¶ 236; Goulet Compl. ¶ 191; Kelly Compl. ¶ 306; Olin Compl. ¶ 235; Peterson Compl. ¶ 191; Williams Compl. ¶ 207.)

225. The MetLife Defendants argue that dismissal is appropriate because Plaintiffs have not alleged any facts showing that the MetLife Defendants had reason to know the Individual Defendants—much less any unnamed compliance officers and underwriters—were incompetent through inherent unfitness or prior specific tortious acts prior to Plaintiffs' investments with Wall Street Capitol. The Court agrees. Despite the plethora of allegations alleging wrongdoing on the part of the Individual Defendants, Plaintiffs do not allege that the Individual Defendants had any disciplinary history, or other specific facts to indicate that the MetLife Defendants were on notice of the Individual Defendants' alleged incompetence. For this reason, Plaintiffs cannot maintain their negligent supervision claims against the MetLife Defendants on any alleged tortious conduct by the Individual Defendants. *See Austin v. Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at *36–27 (N.C. Super. Ct. Jan. 8, 2018) (dismissing a negligent supervision claim where the plaintiffs' complaint was devoid of any allegations that the investment advisor had previously handled client accounts negligently or inappropriately at the corporate defendant's firm or any other firm).

226. Plaintiffs can, however, maintain their claims based on Siskey's allegedly tortious conduct. Plaintiffs have alleged that the MetLife Defendants knew of Siskey's disciplinary history, and in fact, had specific knowledge of Siskey's improper involvement with the Premier Fund and Premier Fund II back in 2002. (J. Aldridge Compl. ¶¶ 74, 234; Goulet Compl. ¶¶ 74, 189; Kelly Compl. ¶¶ 75, 277; Olin Compl. ¶¶ 76, 233; Peterson Compl. ¶¶ 74, 189; Williams Compl. ¶¶ 72, 205.) For 12(b)(6) purposes, this is sufficient. *See White*, 166 N.C. App. at 288, 603 S.E.2d at 152 (reversing the dismissal of the plaintiffs' negligent hiring claim where the complaint alleged that the employee had been engaging in similar illegal activity for several years, resulting in his termination from his prior employer).

227. The MetLife Defendants additionally argue that Plaintiffs cannot maintain their negligent supervision claims because Siskey was not a MetLife employee and the MetLife Defendants can only have a duty to supervise its employees. For the same reasons expressed in Section VI.B regarding Plaintiffs' vicarious liability claims, the Court is unpersuaded by the MetLife Defendants' argument on Rule 12(b)(6) motions that Siskey was not a MetLife employee working out of MetLife's Wall Street Capitol office.

228. The MetLife Defendants also argue that Plaintiffs' negligent supervision claims fail because Plaintiffs have not alleged a nexus or causal relationship between Siskey's employment relationship with the MetLife Defendants and Plaintiffs' alleged injury. It appears to the Court, both through the written briefs submitted by the MetLife Defendants and counsel's arguments at the hearing on the Motions, that the

MetLife Defendants are attempting to distance themselves from Wall Street Capitol, arguing that Plaintiffs' relationships with Siskey and Wall Street Capitol do not create a relationship between Plaintiffs and the MetLife Defendants. The Court is unpersuaded by this argument at this stage. Plaintiffs have alleged that Wall Street Capitol is an office of MetLife, setting forth facts to support this allegation (including MetLife's Certificate of Assumed Named documentation, signage outside the Wall Street Capitol office, and allegedly oral statements by Siskey and the Individual Defendants to that effect). On Rule 12(b)(6) motions, therefore, the Court concludes that Plaintiffs have sufficiently alleged that Wall Street Capitol and MetLife are one and the same.

229. The MetLife Defendants attempt to draw connections between the Plaintiffs here and the plaintiffs in *Stone Street*, where Chief Judge Bledsoe of this Court concluded that there was no alleged nexus or causal connection between Siskey's employment relationship with the MetLife Defendants and the plaintiffs' alleged injury. *Stone St. Partners, LLC v. Williamson*, 2018 NCBC LEXIS 77, at *21 (N.C. Super. Ct. Jul. 26, 2018). However, the position of the plaintiffs in *Stone Street* is vastly different from the plaintiffs in the cases *sub judice*. There, the plaintiffs were business associates of Siskey and his wife in a Charlotte private equity firm. *Id.* at *3. They were not Wall Street Capitol customers or clients, like Plaintiffs here. Therefore, *Stone Street* is easily distinguishable in that regard and does not support the MetLife Defendants' position that, as a matter of law, they owed no duty to Plaintiffs. In fact, Plaintiffs allege they were direct clients and customers of MetLife's

Wall Street Capitol office, and Plaintiffs have alleged that they relied upon investment advice and other representations made by Wall Street Capitol employees. This is sufficient, for 12(b)(6) purposes, to establish the necessary nexus between the MetLife Defendants' relationship with Siskey and Siskey's alleged tortious conduct toward Plaintiffs.

230. For these reasons, the negligent supervision and retention claims averred by J. Aldridge, Goulet, Kelly, Leite, Reittinger, Olin, Peterson, and J. Williams survive dismissal at this early stage in the proceedings and the MetLife Motions are DENIED in that regard.

## I. Professional Negligence (against the Individual Defendants)

231. As an alternative to Plaintiffs' fraud allegations, Plaintiffs assert claims for professional negligence against the Individual Defendants, alleging that the Individual Defendants "negligently failed to act in rendering . . . financial and investment advice to [the Plaintiffs], in accordance with industry standards and the applicable standards of professional care." (J. Aldridge Compl. ¶¶ 228; K. Aldridge Compl. ¶¶ 215; Goulet Compl. ¶¶ 183; Kelly Compl. ¶¶ 298; Olin Compl. ¶¶ 227; Peterson Compl. ¶¶ 183; Williams Compl. ¶¶ 199.) Plaintiffs have not offered, and the Court has not located, any authority to support that a professional negligence claim exists in North Carolina for the negligent acts of investment advisors. Accordingly, the Court analyzes Plaintiffs' claims against the Individual Defendants for negligent investment advice as general negligence claims.

232. To state a claim for negligence, a plaintiff "must allege the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, and a causal relationship between the breach of duty and certain actual injury or loss sustained by the plaintiff." *Sterner*, 159 N.C. App. at 630, 583 S.E.2d at 673 (quotation marks omitted).

233. Plaintiffs allege that the Individual Defendants were licensed securities brokers with MetLife and performed work as financial and investment advisors for MetLife. (*See, e.g.,* J. Aldridge Compl. ¶¶ 24, 27, 31; K. Aldridge Compl. ¶¶ 25, 28, 32; Goulet Compl. ¶¶ 24, 27, 31; Kelly Compl. ¶¶ 29, 32, 36; Olin Compl. ¶¶ 25, 28, 32; Peterson Compl. ¶¶ 24, 27, 31; Williams Compl. ¶¶ 26, 29, 33.) Plaintiffs allege that "under the auspices of specialized licensure, qualifications and MetLife[,]" the Individual Defendants offered specialized financial and investment advice to Plaintiffs, thereby creating a relationship and therefore a duty of care owed by the Individual Defendants to Plaintiffs. (J. Aldridge Compl. ¶ 227; K. Aldridge Compl. ¶ 214; Goulet Compl. ¶ 182; Kelly Compl. ¶ 297; Olin Compl. ¶ 226; Peterson Compl. ¶ 182; Williams Compl. ¶ 198.)

234. The general theory of Plaintiffs' negligence claims is that by referring Plaintiffs to Siskey as an investment advisor despite knowledge of Siskey's disciplinary history, and by otherwise giving inaccurate or misleading investment advice, the Individual Defendants failed to act as prudent investment advisors and their failures resulted in Plaintiffs' loss of the money they invested through Wall Street Capitol.

235. Our courts have consistently held that a duty[24] arises where one person, in the course of his business or profession, provides investment advice to another with the knowledge that his or her advice will be relied upon. *See Howell v. Fisher*, 49 N.C. App. 488, 494–96, 272 S.E.2d 19, 24–25 (1980). Moreover, the North Carolina Administrative Code imposes duties on investment advisors to supervise client accounts. *See, e.g.*, 18 N.C. Admin. Code 6A.1808(d)(2)-(3)). Here, Plaintiffs have alleged that the Individual Defendants provided investment advice by advising them to meet with Siskey about potential investments, (Goulet Compl. ¶ 126; Peterson Compl. ¶ 121); providing inaccurate or incomplete investment statements and advice, (J. Aldridge Compl. ¶ 160; K. Aldridge Compl. ¶ 142; Kelly Compl. ¶¶ 125, 152, 178, 214, 239; Williams Compl. ¶¶ 123, 139); or inducing Plaintiffs to invest in companies that were "guaranteed," or otherwise safe and profitable investments, (*see, e.g.,* J. Aldridge Compl. ¶¶ 126; K. Aldridge Compl. ¶ 138; Olin Compl. ¶¶ 122, 154; Kelly Compl. ¶¶ 119–21, Williams Compl. ¶¶ 118, 135). And while some of these allegations may lack the specificity required by Rule 9(b), and therefore are insufficient to sustain some plaintiffs' fraud claims, they do not fail the general notice-pleading standard for negligence claims. Viewing these allegations in the light most favorable to Plaintiffs, the Court concludes they are sufficient to plead a general duty of care—if not a slightly higher duty due to our State's administrative provisions regarding additional duties imposed on investment advisors—upon the Individual Defendants.

---

[24] The duty discussed herein is not a fiduciary duty. *Compare Howell*, 49 N.C. App. at 494–96, 272 S.E.2d at 24–25, *with Dallaire*, 367 N.C. at 368, 760 S.E.2d at 266–67.

236. The other elements—breach and causation—are also sufficiently pleaded. The Plaintiffs' allegations, liberally construed, describe specific conduct by the Individual Defendants that supports Plaintiffs' negligence claims against them beyond the conclusory allegations under their claim headings. (*See* J. Aldridge Compl. ¶¶ 228, 229; K. Aldridge Compl. ¶¶ 215, 216; Goulet Compl. ¶¶ 183, 184; Kelly Compl. ¶¶ 298, 299; Olin Compl. ¶¶ 227, 228; Peterson Compl. ¶¶ 183, 184; Williams Compl. ¶¶ 199, 200.) These negligence claims, pleaded in the alternative to Plaintiffs' fraud claims, allege facts showing the Individual Defendants' failure to conform to industry standards or to overlook or ignore questionable transactions, either with the Individual Defendants' direct participation, or by virtue of the Individual Defendants' knowledge of Siskey's involvement with their clients. Under the standards of Rule 12(b)(6), the Court concludes that Plaintiffs' negligence claims are sufficient to withstand dismissal.

237. As a result, the Court DENIES the Individual Defendants' Motions with respect to Plaintiffs' professional negligence claims.

## J. UDTP (against the MetLife Defendants)

238. Plaintiffs each allege UDTP claims pursuant to section 75.1.1 of the North Carolina General Statutes against the MetLife Defendants. (J. Aldridge Compl. ¶¶ 239−48; K. Aldridge Compl. ¶¶ 226−35; Goulet Compl. ¶¶ 196−203; Kelly Compl. ¶¶ 309−18; Olin Compl. ¶¶ 238−44; Peterson Compl. ¶¶ 194−203; Williams Compl. ¶¶ 210−19.) Plaintiffs' UDTP claims are based on the Insurance Ponzi Scheme and Plaintiffs' resulting injury. While the specific allegations in each complaint differ

slightly, Plaintiffs' injuries can be adequately divided into three categories: (1) Plaintiffs who were MetLife insurance customers with policies that were involved in the Insurance Ponzi Scheme; (2) Plaintiffs who were MetLife insurance customers but did not have policies involved in the Insurance Ponzi Scheme; and (3) Plaintiffs who were not MetLife insurance customers but were allegedly harmed by the Insurance Ponzi Scheme because it helped "perpetuate" Siskey's Investment Ponzi Scheme.

239. With respect to the last category, Goulet, the Kelly Plaintiffs, and V. Williams have not specifically alleged that they had MetLife insurance policies, let alone that any such policies involved in the Insurance Ponzi Scheme. Rather, these Plaintiffs allege that they were injured by the Insurance Ponzi Scheme because it "helped perpetuate the Wall Street Capitol Ponzi Scheme[,]" which, based on a fair reading of the Complaints, refers primarily to the Investment Ponzi Scheme.

240. Standing for redress of UDTP is governed by N.C.G.S. § 75-16, which provides:

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done . . . .

N.C.G.S. § 75-16.

241. Thus, standing for a UDTP claim is broad and gives anyone whose injury is proximately caused by an unfair or deceptive act standing to sue. *See Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 67-68, 653 S.E.2d 393, 396-97 (2007).

However, as with other causes of action, to have standing to bring a UDTP claim, "the plaintiff must prove the elements of standing, including 'injury in fact.'" *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 175, 684 S.E.2d 41, 52 (2009) (addressing the question of standing for a UDTP claim). To allege an injury in fact, Plaintiffs must allege "an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.]" *Id.* Goulet, the Kelly Plaintiffs, and V. Williams have not alleged that they owned any MetLife insurance policies, or that Siskey or any of the Defendants ever talked to them about purchasing insurance. Any alleged injury because the Insurance Ponzi Scheme helped "perpetuate" the Investment Ponzi Scheme relies upon a chain of attenuated inferences that are speculative and conjectural.[25] Therefore, the Court concludes that Goulet, the Kelly Plaintiffs, and V. Williams have failed to allege a concrete, particularized injury sufficient to establish standing.

242. Likewise, the Court does not believe the Plaintiffs who allege the second type of injury (Olin, Peterson, and J. Williams) have established standing to bring their UDTP claims. Although these Plaintiffs allege they have MetLife insurance policies,[26] they have not alleged that their policies were involved in the Insurance

---

[25] The Court notes that the connection between the Investment Ponzi Scheme and the Insurance Ponzi Scheme mentioned in Plaintiffs' constructive fraud claim represents the opposite causal connection; there, the Investment Ponzi Scheme aided the Insurance Ponzi Scheme, but here Plaintiffs allege that the Insurance Ponzi Scheme aided the Investment Ponzi Scheme.

[26] The Olin Complaint specifically alleges that Olin had MetLife insurance policies. (Olin Compl. ¶ 117.) Peterson and J. Williams, in their respective complaints, allege (in a conclusory fashion) that they were MetLife "insurance customers[,]" (Peterson Compl. ¶ 113; Williams Compl. ¶ 114) but do not refer to any specific policy in their allegations.

Ponzi Scheme. Although they were insurance customers of MetLife, the Court cannot conclude that this fact alone is sufficient to establish a concrete and particularized injury arising from the Insurance Ponzi Scheme. Accordingly, the Court DISMISSES the UDTP claims asserted in the Complaints filed by Goulet, the Kelly Plaintiffs, Olin, Peterson, and the Williamses.

243. In contrast, J. Aldridge and K. Aldridge allege that they were directly injured by the Insurance Ponzi Scheme because J. Aldridge's insurance policies were a part of the Insurance Ponzi Scheme. The Court concludes, however, that K. Aldridge has made no allegations to support that she has a legally vested interest in her husband's life insurance policies and therefore cannot state a claim based on these policies. Therefore, K. Aldridge's UDTP claim is DISMISSED.

244. On the other hand, the Court concludes that J. Aldridge has standing to bring his UDTP claim. He alleges with particularity how his policies were involved in the Insurance Ponzi Scheme. The MetLife Defendants seek to dismiss J. Aldridge's UDTP claim nonetheless, arguing that (1) the contents of the insurance policies undermine J. Aldridge's allegations; and (2) the claim is barred by the four-year statute of limitations. First, as noted in the Court's discussion of J. Aldridge's fraud claim, the contents of J. Aldridge's insurance contracts do not necessarily defeat his claims. Second, the Court concludes that J. Aldridge's UDTP claim cannot be dismissed as time-barred based on J. Aldridge's allegations. His UDTP claim is based, in part, on fraud and a cause of action for UDTP alleging fraud is deemed to accrue upon discovery by the plaintiff of the facts constituting fraud. *Carlisle v. Keith,*

169 N.C. App. 674, 683, 614 S.E.2d 542, 548 (2005). As discussed in Section VI.A. of this Opinion, the allegations of J. Aldridge's complaint do not permit the Court to conclude as a matter of law that J. Aldridge could have discovered the Insurance Ponzi Scheme at the time he entered into his contracts in either 2004 or 2011. Accordingly, the MetLife Motion seeking to dismiss J. Aldridge's UDTP claim is DENIED.

### K. Punitive Damages (against all Defendants)

245. Plaintiffs allege in each of the Complaints a separate, independent cause of action for punitive damages. (J. Aldridge Compl. ¶¶ 225–59; K. Aldridge Compl. ¶¶ 242–46; Goulet Compl. ¶¶ 210–14; Kelly Compl. ¶¶ 325–29; Olin Compl. ¶¶ 251–55; Peterson Compl. ¶¶ 210–14; Williams Compl. ¶¶ 226–30.) North Carolina courts have repeatedly held that "a claim for punitive damages is not a stand-alone claim." *Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 425 (2015); *see also Thompson v. Bank of Am., N.A.*, 2015 N.C. App. LEXIS 660, at *12 (N.C. Ct. App. Aug. 4, 2015); *Collier v. Bryant*, 216 N.C. App. 419, 434, 719 S.E.2d 70, 82 (2011); *Iadanza v. Harper*, 169 N.C. App. 776, 783, 611 S.E.2d 217, 223 (2006). Therefore, the Court DISMISSES Plaintiffs' claims for punitive damages to the extent punitive damages are sought as standalone claims but DENIES the Motions to the extent they seek to dismiss punitive damages as a remedy for Plaintiffs' surviving substantive claims for which punitive damages may be awarded under applicable law.

## VII. CONCLUSION

246. **THEREFORE**, based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** the Motions as set forth below:

A. As to the J. Aldridge Complaint:

    1. Lowder's motion is **DENIED** as to J. Aldridge's fraud by affirmative misrepresentation claim, but is **GRANTED** as to J. Aldridge's fraud by omissions claim.

    2. The MetLife Defendants' motion is **GRANTED** only to the extent J. Aldridge attempts to bring a fraud by affirmative misrepresentation claim directly against the MetLife Defendants. The MetLife Defendants' motion is otherwise **DENIED** as to J. Aldridge's fraud claim.

    3. Lowder's motion is **GRANTED** as to J. Aldridge's constructive fraud claim, and that claim is dismissed with prejudice.

    4. The MetLife Defendants' motion is **GRANTED** only to the extent brought on a theory of vicarious liability. The MetLife Defendants' motion is **DENIED** as to J. Aldridge's direct constructive fraud claim brought against them.

    5. Lowder's motion is **DENIED** as to J. Aldridge's negligent misrepresentation claim.

    6. The MetLife Defendants' motion is **DENIED** as to J. Aldridge's negligent misrepresentation claim based on a theory of vicarious liability,

but is **GRANTED** to the extent brought directly against the MetLife Defendants.

7. Lowder's Motion is **DENIED** as to J. Aldridge's NCSA claim.

8. The MetLife Defendants' motion is **DENIED** as to J. Aldridge's NCSA claim premised on "control person" liability, but is **GRANTED** as to J. Aldridge's NCSA claim premised on "aiding and abetting."

9. The MetLife Defendants' motion is **DENIED** as to J. Aldridge's negligence (negligent supervision) claim.

10. Lowder's motion is **DENIED** as to J. Aldridge's professional negligence (general negligence) claim.

11. The MetLife Defendants' motion is **DENIED** as to J. Aldridge's UDTP claim.

12. J. Aldridge's claim for punitive damages is **DISMISSED**, but J. Aldridge may seek punitive damages in connection with his surviving claims that warrant such relief.

B. As to the K. Aldridge Complaint:

1. Lowder and Hammond's motion is **DENIED** as to K. Aldridge's fraud by affirmative misrepresentation claim, but is **GRANTED** as to K. Aldridge's fraud by omissions claim.

2. The MetLife Defendants' motion is **DENIED** as to K. Aldridge's fraud by affirmative misrepresentation claim brought on a theory of vicarious liability, but is **GRANTED** to the extent brought directly

against the MetLife Defendants. The MetLife Defendants' motion is **DENIED as MOOT** as to K. Aldridge's fraud by omissions claim brought directly against the MetLife Defendants.

3. Lowder and Hammond's motion is **GRANTED** as to K. Aldridge's constructive fraud claim.

4. The MetLife Defendants' motion is **DENIED as MOOT** as to K. Aldridge's direct constructive fraud claim against them and is **GRANTED** to the extent brought on a theory of vicarious liability.

5. Lowder and Hammond's motion is **DENIED** as to K. Aldridge's negligent misrepresentation claim.

6. The MetLife Defendants' motion is **DENIED as MOOT** as to K. Aldridge's negligent misrepresentation claim brought directly against them and is otherwise **DENIED**.

7. Lowder and Hammond's motion is **DENIED** as to K. Aldridge's NCSA claim.

8. The MetLife Defendants' motion is **DENIED** as to K. Aldridge's NCSA claim premised on "control person" liability, but is **GRANTED** as to K. Aldridge's NCSA claim premised on "aiding and abetting."

9. The MetLife Defendants' motion is **DENIED as MOOT** as to K. Aldridge's negligence (negligent supervision) claim.

10. Lowder and Hammond's motion is **DENIED** as to K. Aldridge's professional negligence (general negligence) claim.

11. The MetLife Defendants' motion is **GRANTED** as to K. Aldridge's UDTP claim, and that claim is dismissed with prejudice.

12. K. Aldridge's claim for punitive damages is **DISMISSED**, but K. Aldridge may seek punitive damages in connection with her surviving claims that warrant such relief.

C. As to the Goulet Complaint:

1. Hammond's motion is **GRANTED** as to Goulet's fraud by affirmative misrepresentation claim, but is **DENIED** as to Goulet's fraud by omissions claim.

2. The MetLife Defendants' motion is **DENIED** as to Goulet's fraud by affirmative misrepresentation claim to the extent brought on a theory of vicarious liability based on Siskey's misrepresentations, but is **GRANTED** to the extent brought directly against the MetLife Defendants. The MetLife Defendants' motion is **DENIED** as to Goulet's fraud by omissions claim.

3. Hammond's motion is **GRANTED** as to Goulet's constructive fraud claim, and that claim is dismissed with prejudice.

4. The MetLife Defendants' motion is **GRANTED** as to Goulet's constructive fraud claim, and this claim is dismissed with prejudice.

5. Hammond's motion is **GRANTED** as to Goulet's negligent misrepresentation claim, and that claim is dismissed with prejudice.

6. The MetLife Defendants' motion is **GRANTED** as to Goulet's negligent misrepresentation claim brought directly against them, but is **DENIED** as to Goulet's negligent misrepresentation claim based on a theory of vicarious liability for Siskey's negligent misrepresentations.

7. Hammond's motion is **GRANTED** as to Goulet's NCSA claim, and that claim is dismissed with prejudice.

8. The MetLife Defendants' motion is **GRANTED** as to Goulet's NCSA claim, and that claim is dismissed with prejudice.

9. The MetLife Defendants' motion is **DENIED** as to Goulet's negligence (negligent supervision) claim.

10. Hammond's motion is **DENIED** as to Goulet's professional negligence (general negligence) claim.

11. The MetLife Defendants' motion is **GRANTED** as to Goulet's UDTP claim, and that claim is dismissed with prejudice.

12. Goulet's claim for punitive damages is **DISMISSED**, but Goulet may seek punitive damages in connection with his surviving claims that warrant such relief.

D. As to the Kelly Complaint:

1. Phillips's motion is **GRANTED** as to the Kelly Plaintiffs' fraud claims, and their fraud claims are thus dismissed with prejudice.

2. The MetLife Defendants' motion is **GRANTED** as to the Kelly Plaintiffs' fraud by affirmative misrepresentation claims based on a

theory of vicarious liability, but is **DENIED** as to the Kelly Plaintiffs' direct fraud by omissions claims.

3. Phillips's motion is **GRANTED** as to the Kelly Plaintiffs' constructive fraud claims, and these claims are dismissed with prejudice.

4. The MetLife Defendants' motion is **GRANTED** as to the Kelly Plaintiffs' constructive fraud claims (with the exception of the Lemonses, whose direct constructive fraud claims are **DENIED as MOOT**).

5. Phillips's motion is **GRANTED** only as to H. Lemons' negligent misrepresentation claim. Phillips's motion as to the Kelly Plaintiffs' negligent misrepresentation claims is otherwise **DENIED**.

6. The MetLife Defendants' motion is **GRANTED** as to the Kelly Plaintiffs' negligent misrepresentation claims brought directly against these defendants, but is **DENIED** as to the Kelly Plaintiffs' (other than H. Lemons's) negligent misrepresentation claims based on a theory of vicarious liability.

7. Phillips's motion is **GRANTED** as to the Kelly Plaintiffs' NCSA claims, and these claims are dismissed with prejudice.

8. The MetLife Defendants' motion is **GRANTED** as to the Kelly Plaintiffs' NCSA claims, and these claims are dismissed with prejudice.

9. The MetLife Defendants' motion is **DENIED** as to Kelly's, Leite's, and Reittinger's negligence (negligent supervision) claims. The MetLife

Defendants' motion is **DENIED as MOOT** as to the Lemonses' negligence (negligent supervision) claims.

10. Phillips's motion is **DENIED** as to the Kelly Plaintiffs' professional negligence (general negligence) claims.

11. The MetLife Defendants' motion is **GRANTED** as to the Kelly Plaintiffs' UDTP claims, and these claims are dismissed with prejudice.

12. The Kelly Plaintiffs' claims for punitive damages are **DISMISSED**, but these plaintiffs may seek punitive damages in connection with their surviving claims that warrant such relief.

E.   As to the Olin Complaint:

1. Lowder and Hammond's motion is **GRANTED** as to Olin's fraud claim against them, and this claim is dismissed with prejudice.

2. The MetLife Defendants' motion is **GRANTED** as to Olin's fraud by affirmative misrepresentation claim brought directly against them, but is otherwise **DENIED**.

3. Lowder and Hammond's motion is **GRANTED** as to Olin's constructive fraud claim, and that claim is dismissed with prejudice.

4. The MetLife Defendants' motion is **GRANTED** as to Olin's constructive fraud claim, and that claim is dismissed with prejudice.

5. Lowder and Hammond's motion is **GRANTED** as to Olin's negligent misrepresentation claim, and that claim is dismissed with prejudice.

6. The MetLife Defendants' motion is **GRANTED** as to Olin's negligent misrepresentation claim brought directly against these defendants, but is **DENIED** as to Olin's negligent misrepresentation claim based on a theory of vicarious liability for Siskey's negligent misrepresentations.

7. Lowder and Hammond's motion is **GRANTED** as to Olin's NCSA claim, and that claim is dismissed with prejudice.

8. The MetLife Defendants' motion is **GRANTED** as to Olin's NCSA claim, and that claim is dismissed with prejudice.

9. Lowder and Hammond's motion is **GRANTED** as to Olin's NCIAA claim, and that claim is dismissed with prejudice.

10. The MetLife Defendants' motion is **GRANTED** as to Olin's NCIAA claim, and that claim is dismissed with prejudice.

11. The MetLife Defendants' motion is **DENIED** as to Olin's negligence (negligent supervision) claim.

12. Lowder and Hammond's motion is **DENIED** as to Olin's professional negligence (general negligence) claim.

13. The MetLife Defendants' motion is **GRANTED** as to Olin's UDTP claim, and that claim is dismissed with prejudice.

14. Olin's claim for punitive damages is **DISMISSED**, but Olin may seek punitive damages in connection with his surviving claims that warrant such relief.

F.     As to the Peterson Complaint:

1.     Hammond's motion is **GRANTED** as to Peterson's fraud by affirmative misrepresentation claim, but is **DENIED** as to Peterson's fraud by omissions claim.

2.     The MetLife Defendants' motion is **GRANTED** as to Peterson's fraud by affirmative misrepresentation claim brought directly against them, but is otherwise **DENIED**.

3.     Hammond's motion is **GRANTED** as to Peterson's constructive fraud claim, and that claim is dismissed with prejudice.

4.     The MetLife Defendants' motion is **GRANTED** as to Peterson's constructive fraud claim, and that claim is dismissed with prejudice.

5.     Hammond's motion is **GRANTED** as to Peterson's negligent misrepresentation claim, and that claim is dismissed with prejudice.

6.     The MetLife Defendants' motion is **GRANTED** as to Peterson's negligent misrepresentation claim brought directly against them, but is **DENIED** as to Peterson's negligent misrepresentation claim based on a theory of vicarious liability for Siskey's negligent misrepresentations.

7.     Hammond's motion is **GRANTED** as to Peterson's NCSA claim, and that claim is dismissed with prejudice.

8.     The MetLife Defendants' motion is **GRANTED** as to Peterson's NCSA claim, and that claim is dismissed with prejudice.

9. The MetLife Defendants' motion is **DENIED** as to Peterson's negligence (negligent supervision) claim.

10. Hammond's motion is **DENIED** as to Peterson's professional negligence (general negligence) claim.

11. The MetLife Defendants' motion is **GRANTED** as to Peterson's UDTP claim, and that claim is dismissed with prejudice.

12. Peterson's claim for punitive damages is **DISMISSED**, but Peterson may seek punitive damages in connection with his surviving claims that warrant such relief.

G. As to the Williams Complaint:

1. Phillips motion is **DENIED** as to the Williamses' fraud by affirmative misrepresentation claim, but is **GRANTED** as to the Williamses' fraud by omissions claim.

2. The MetLife Defendants' motion is **GRANTED** as to the Williamses' fraud by affirmative misrepresentation claim bought directly against the MetLife Defendants, but is otherwise **DENIED**. However, V. Williams's fraud by omissions claim against the MetLife Defendants is **DENIED** as MOOT.

3. Phillips's motion is **GRANTED** as to the Williamses' constructive fraud claim, and that claim is dismissed with prejudice.

4. The MetLife Defendants' motion is **GRANTED** as to the Williamses constructive fraud claim to the extent brought on a theory of vicarious

liability. The MetLife Defendants' motion as to Williamses' constructive fraud is otherwise **DENIED**. However, V. Williams' constructive fraud claim brought directly against MetLife is **DENIED as MOOT**.

5. Phillips's motion is **DENIED** as to the Williamses' negligent misrepresentation claim.

6. The MetLife Defendants' motion is **GRANTED** as to the Williamses' negligent misrepresentation claim brought directly against these defendants, but is **DENIED** as to the Williamses' negligent misrepresentation claim based on a theory of vicarious liability.

7. Phillips's motion is **DENIED** as to the Williamses' NCSA claim.

8. The MetLife Defendants' motion is **DENIED** as to the Williamses' NCSA claim premised on "control person" liability, but is **GRANTED** as to the Williamses' NCSA claim premised on "aiding and abetting."

9. The MetLife Defendants' motion is **DENIED** as to J. Williams' negligence (negligent supervision) claim. The MetLife Defendants' motion is **DENIED as MOOT** as to V. Williams's negligence (negligent supervision) claim.

10. Phillips's motion is **DENIED** as to the Williamses' professional negligence (general negligence) claim.

11. The MetLife Defendants' motion is **GRANTED** as to the Williamses' UDTP claim, and that claim is dismissed with prejudice.

12. The Williamses' claim for punitive damages is **DISMISSED**, but the Williamses may request punitive damages in connection with their surviving claims that warrant such relief.

247. Except as otherwise expressly granted, denied, or denied as moot, the Motions are **DENIED**.

    **SO ORDERED**, this the 31st day of December, 2019.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases